(116 So. 399)

No. 26879.

## O'FERRALL v. NASHVILLE BRIDGE CO.

March 12, 1928.

*(Syllabus by Editorial Staff.)*

1. **Physicians and surgeons ⬤⟞23—Physician treating injured employees under verbal contract with employer's agent may recover fees from employer without being limited to statutory fees (Workmen's Compensation Act, § 8, as amended by Act No. 43 of 1922).**

Physician *held* entitled to recover from employer for treatment of injured employees without regard to any limitation of Workmen's Compensation Act (Act No. 20 of 1914), § 8, as amended by Act No. 43 of 1922, as to fees for medical services, in view of verbal contract between physician and employer's representative and telegram from employer exhibited to physician which showed authority of such representative.

2. **Evidence ⬤⟞584(3)—Testimony and corroborating circumstances held sufficient to fulfill statutory requirement for proof of physician's verbal contract for amount exceeding $500, for treating injured employees (Civ. Code, art. 2277).**

In action by physician for fees for services rendered injured employees of defendant under verbal contract with defendant's representative, evidence and corroborating circumstances *held* sufficient to comply with Civ. Code, art. 2277, requiring that verbal contract for payment of amount exceeding $500 must be proved by one credible witness and corroborating circumstances.

3. **Frauds, statute of ⬤⟞23(4)—Employer's contract for medical services for injured employees held not promise to pay debt of third person, within statute (Civ. Code, art. 2278).**

Employer's contract with physician for treatment of injured employees is not affected by Civ. Code, art. 2278, declaring that parol evidence should not be received to prove promise to pay debt of third person, since employer had personal interest in saving men's lives because of possibility of being answerable in damages.

4. **Master and servant ⬤⟞385(16)—Employer may extend its liability for medical service to injured employees beyond amount stipulated by Workmen's Compensation Law (Workmen's Compensation Act, § 8, as amended by Act No. 43 of 1922).**

Although employer has right to limit its liability for medical service to injured employees to amount allowed by Workmen's Compensation Law (Act No. 20 of 1914), § 8, as amended by Act No. 43 of 1922, it is also at liberty to extend its liability beyond what law requires.

5. **Physicians and surgeons ⬤⟞23—$6,500 held not excessive for medical services covering several months to seven men who fell 30 feet onto steel floor.**

$6,500 *held* not excessive for medical services to 7 injured men who fell 25 or 30 feet to steel floor of tank and were horribly mangled, requiring treatment over period of several months, especially where such treatment resulted in recovery of 6.

Appeal from Civil District Court, Parish of Orleans; H. C. Cage, Judge.

Action by Dr. John T. O'Ferrall against the Nashville Bridge Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Terriberry, Young, Rault & Carroll and Spearing & Mabry, all of New Orleans, for appellant.

John May, of New Orleans, for appellee.

O'NIELL, C. J. This is a suit for fees charged for medical and surgical treatment rendered by the plaintiff to seven employees of the defendant, who were injured in an accident. The civil district court gave judgment in favor of the plaintiff for the amount sued for, $6,500. The defendant has appealed from the decision.

The appellant pleaded, in defense of the suit, first, that there was no contract of em-

ployment between the plaintiff and defendant; second, that, if there was an agreement between the plaintiff and a representative of the defendant, the representative had no authority to make such a contract for the defendant; third, that, if there was such a contract, it was a contract to pay the debts of third persons—the seven injured men—and, being only a verbal contract, was not enforceable, because article 2278 of the Civil Code declares that parol evidence shall not be received to prove any promise to pay the debt of a third person; fourth, that the fees for medical and surgical treatment rendered to the injured workmen were governed and limited in amount by the Workmen's Compensation Law, or Employers' Liability Act —section 8 of Act 20 of 1914, as amended by Act 43 of 1922, p. 74—which required the employer, in every case coming under the provisions of the act, to furnish the employee reasonable medical, surgical, and hospital services and medicines, not to exceed $250 in value. The defendant pleaded also, as an alternative defense, to be considered only in the event that the court should hold the defendant liable beyond the limit of $250 for each injured man, that the fees charged by the plaintiff were excessive.

The plaintiff is a prominent surgeon, practicing in New Orleans, and making a specialty of orthopedic surgery. The defendant is a corporation engaged in the building of steel structures and having headquarters at Nashville, Tenn. At the time of the accident from which this suit arose, the defendant maintained an office in New Orleans, under the supervision of a consulting and constructing engineer named A. W. Woodman. The company was engaged in the construction of a large steel tank for the Sinclair Oil Company, at Mereaux, in St. Bernard parish, near the city limits of New Orleans. The foreman in charge of the construction work, and employed by the defendant, was George T. McMurtry, who was on the job at the time of the accident. John W. Evans was superintendent of the plant of the Sinclair Oil Company at the time of the accident. Seven mechanics employed by the defendant were working at and under the roof of the tank, and were on a scaffold, suspended from the roof, when the scaffold collapsed and the men fell twenty-five or thirty feet, upon the steel floor of the tank. They were horribly mangled. As the superintendent, Evans, said in his testimony:

"The men were lying there, a mass of blood and broken bones."

Evans had his employees to remove the men from the tank, and immediately telephoned to Woodman, at his office in New Orleans. Meantime Evans had obtained hurriedly from one of his clerks who lived in New Orleans a list of four of the best surgeons in the city, of whom the clerk recommended Dr. O'Ferrall as the best orthopedic surgeon, or bone specialist, as the witnesses called him. Evans told Woodman of the nature and seriousness of the accident, said that he had telephoned to the Charity Hospital for ambulances, and said that the men's injuries were of such character that he thought Woodman's company should have a good bone specialist to attend to them. Woodman said that he thought so too, judging from the height from which the men had fallen to the steel floor of the tank; and, being not acquainted with any surgeon in New Orleans, Woodman requested Evans to select the surgeon, and said that he "would indorse his choice." Evans then told Woodman of Dr. O'Ferrall's reputation as a bone specialist, and Woodman said, "Fine, go get him, Jimmy." Evans telephoned to the doctors' exchange, to locate Dr. O'Ferrall. Before the doctor answered on the telephone, two of the

ambulances from the Charity Hospital had arrived and departed with two of the injured men. When Evans got into communication with Dr. O'Ferrall, Evans told him of the accident, said that the men had many bones broken, and asked the doctor if he could take care of the men, and the doctor replied that he could. Then Evans told the doctor that two of the ambulances were already on their way to the Charity Hospital, and the doctor replied that he had not sufficient facilities at his command at the Charity Hospital to treat that many patients for such injuries at one time, and he said that the men would have to be sent to Touro Infirmary for him to treat them. Evans assented, and telephoned to the Charity Hospital and diverted the two ambulances to Touro Infirmary and sent the remaining injured men also to Touro Infirmary.

As soon as Woodman had given the instructions to Evans to employ Dr. O'Ferrall, he, Woodman, wired the defendant at Nashville:

"Scaffold broke at Sinclair dropping seven men, all seriously injured,"

—and Woodman got into a taxicab and went to the scene of the accident. He arrived just as the last ambulance was leaving for Touro Infirmary with the last of the seven injured men. After looking over the situation and attempting to make a photograph of the inside of the tank, he returned to his office in New Orleans, and there found a telegram from the president of his company, saying:

"Retell accident. No record [of] insurance here [on] that job. See that men are well taken care of and left on pay roll."

Woodman then went to Touro Infirmary, saw the injured men, and saw Dr. O'Ferrall and showed him the telegram from the defendant. Woodman, as a witness, when asked if he had shown Dr. O'Ferrall the telegram, said:

"Yes, as evidence that I was doing right in employing him."

Dr. O'Ferrall then told Woodman that the injured men would need both day and night nurses, and that he, Dr. O'Ferrall, would also have to employ eye and nose specialists for them; to all of which Woodman made no objection, but, on the contrary, said to give the men whatever they needed. Accordingly the day and night nurses and the eye and nose specialists were employed, as were also specialists on certain internal injuries; and all of the persons so employed assisted in bringing about a marvelous recovery of six of the injured men. One died in the infirmary thirty-four days after the accident.

McMurtry also called at the infirmary on the afternoon of the accident and discussed the case with Dr. O'Ferrall, and in their conversation they referred to the telegram which Woodman had received from the Nashville Bridge Company, and Dr. O'Ferrall told McMurtry that he, the doctor, would give the injured men whatever service and attention they needed. McMurtry testified that he merely requested the doctor to see that the injured men received "first aid," but Dr. O'Ferrall, in his testimony, denied that anything was said about "first aid," and the doctor reminded the court that it would have been foolish then to talk about giving the men "first aid," when they were already in a high-class infirmary, receiving as good medical and surgical service and attention as money and science could afford.

On Woodman's return from the infirmary to his office, on the evening of the accident, he found another telegram from his company, signed by the president, saying:

"Find we have insurance here. Will you ask Fidelity & Guaranty Company disregard instructions regarding pay roll. Have reported accident and promised details to local agent. Co-operate with New Orleans agent."

Woodman did not show that telegram to Dr. O'Ferrall; and the doctor did not know until three weeks after the accident that an insurance company was interested in the case, or that the allowance for medical, sur- gical and hospital treatment might be limit- ed by the Workmen's Compensation Law, as far as the injured workmen were concerned.

The six men who recovered from their in- juries were under the care and treatment of Dr. O'Ferrall over seven months. Meanwhile Woodman and McMurtry visited them regu- larly, and Woodman frequently consulted·the doctor about the condition of the men, at the infirmary and at the doctor's private office; and another representative of the company, a consulting engineer named Blair, came from Nashville and called to see the men at the infirmary twice with McMurtry. The record leaves no doubt that Woodman or McMurtry, or both of them, kept the officers of their company at Nashville advised of the character and scope of the treatment that was being rendered by Dr. O'Ferrall to the injured men. Bills for the infirmary charg- es and the nurses' services were rendered weekly by Dr. O'Ferrall to the defendant, through Woodman. About three weeks aft- er the accident, the·doctor inquired of Wood- man as to whether he had forwarded the bills to the Nashville Bridge Company, and as to why they were not paid; and the doc- tor was then told, for the first time, that the company would contend that his employer was an insurance company and that his com- pensation for medical, surgical, and hospital treatment would be limited to the amount al- lowed the injured workmen by the Workmen's Compensation Law. Dr. O'Ferrall promptly declined to recognize any other employer than the National Bridge Company, or to admit that the fees and charges for medical, sur- gical and hospital treatment were limited,

as far as he was concerned, by the Work- men's·Compensation Law.

On the twenty-sixth day after the accident, Dr. O'Ferrall received a letter from the sec- retary treasurer of the Nashville Bridge Com- pany, saying:

"This is written to express our gratification at the splendid reports we have received re- garding your successful treatment of our em- ployees who were injured in the accident in the Sinclair plant. We congratulate ourselves, the men, the insurer, and you, upon the results, and feel fortunate that the treatment and care of the injured men fell into such capable hands. This company's liability in connection with the accident is fully covered by policy in the U. S. F. & G. Company, and it is presumed that your account will be handled through our New Or- leans agents, Buck & McGrath."

At the same time Dr. O'Ferrall received a letter from Woodman, inclosing blank forms furnished by the United States Fidelity & Guaranty Company, on which the surgeon was to make his so-called "First Report" on the condition of the injured men. Replying to the letter of the secretary treasurer, Dr. O'Ferrall expressed his appreciation of the compliment paid him, but reminded the com- pany that he was employed by the company's representatives to treat the injured men, and said that he had no communication with the insurance· company, that he believed that the bridge company would stand behind its representatives, and that he would render his bills to the bridge company as the respon- sible party. At the same time, Dr. O'Ferrall replied to Woodman's letter, and said that, having accepted the responsibility for treat- ing the men from the representatives of the Nashville Bridge Company, he would not deal with an insurance company in relation to the case, and that he had had the necessity for so confining his dealings brought forcibly to his attention by the telephone conversation with Woodman a few days before, in which the latter had said that the insurance com- pany wished to keep the cost of treating the

injured men within statutory limits. The doctor said, in his letter to Woodman, that if the headings of the blank forms of reports were changed so as to read "Nashville Bridge Company" instead of "United States Fidelity & Guaranty Company" he would be pleased to fill out and sign them. Thereafter, the United States Fidelity & Guaranty Company returned the blanks to Dr. O'Ferrall, in a letter, saying that the company understood that the doctor had declined to report to any one but the Nashville Bridge Company, and asking the surgeon to fill out and sign the reports and send them to the bridge company, so that the men would "not be held off any longer for payment of compensation on account of lack of medical reports." Dr. O'Ferrall sent the letter from the fidelity and guaranty company, together with the blank forms of reports, to Woodman, in a letter saying that he, the doctor, would fill out and sign the reports if Woodman would first sign for the bridge company the blank forms, annexed to the blank forms of reports, requesting the medical and surgical treatment. Thereafter, at the request of a member of the defendant's clerical force, McMurtry signed for the defendant the blank forms, annexed to the medical and surgical report blanks, requesting Dr. O'Ferrall to render such medical and surgical treatment as might be necessary to properly care for each of the injured men. The doctor then made his reports to the defendant. Considerable correspondence followed, in which the defendant sought to fix the liability on the United States Fidelity & Guaranty Company for the medical, surgical and hospital treatment, and to limit the charges to $250 for each of the seven men. The plaintiff finally wrote to the Nashville Bridge Company that it seemed to him unnecessary to continue the endless discussion as to whether the bridge company or the insurance company was responsible for his fees, or as to whether they were limited by the Workmen's Compensation Law, and the doctor demanded that the defendant advise him definitely whether the defendant desired that he should continue as the defendant's surgeon in charge of the cases. That was more than two months after the accident; and the six injured men—one having died—remained under the defendant's care and treatment nearly four months longer, until they were practically well enough to return to work.

[1-4] Our conclusion is that the judgment appealed from is correct. There was a verbal contract between the plaintiff and the defendant's representative, John W. Evans, acting under instructions from A. W. Woodman. The telegram which Woodman exhibited to the plaintiff was ample evidence of Woodman's authority under the urgent circumstances of the case. It will not do to say that it requires a meeting and resolution of the board of directors of a corporation to authorize the employment of a physician or surgeon in an emergency, such as there was in this instance. The facts which we have recited show that the company was informed of the contract of employment and tacitly ratified it and received the benefit of it. Appellant's counsel cite article 2277 of the Civil Code, which requires that a verbal contract for the payment of an amount exceeding $500 is not enforceable unless proved by the testimony of at least one credible witness and corroborating circumstances. The contract sued on is proved to our satisfaction by the testimony of the plaintiff and of Woodman and Evans and McMurtry, and by the corroborating circumstances which we have related. Article 2278 of the Civil Code is not applicable to this case, because the verbal contract sued on was not merely a promise to pay the debt of a third person. The obligation to pay the surgeon the customary and reason-

able charges for his services was incurred by the defendant, not merely for the benefit of the injured men, but for the benefit of the defendant, as the employer of the men, responsible not only morally but legally for the injuries which the men had suffered; and, while the defendant had the right to limit its liability to the amount allowed by the Workmen's Compensation Law, the defendant was also at liberty to extend its liability beyond what the law required. Aside from the Workmen's Compensation Law, the defendant had an interest in saving the men's lives, and in saving their bodies as far as that was possible, because of the fear or possibility of being answerable in damages. An obligation incurred under those circumstances, by one who has an interest to protect by incurring the obligation, is not the obligation merely of a third person, within the meaning of article 2278, even though the consideration for which the obligation was incurred has inured more to the benefit of a third person than to that of the party incurring the obligation. The Workmen's Compensation Law has really nothing to do with the case. The statute merely fixes or limits the liability of the employer to an injured employee, or to his dependents in case of his death; it does not forbid the employer to go beyond the statutory limit in his dealings with those who render the medical, surgical or hospital services to the injured employee.

[5] As to the amount of the fees charged, the plaintiff and two other reputable surgeons testified that the fees were just and reasonable, and there is no evidence to the contrary. The extent and the favorable results of the services are not disputed. We have no reason to doubt that the fees charged are in line with the usual and customary fees charged by reputable surgeons for such treatment and services.

The judgment is affirmed.