DRS. TOLER & TOLER v. MUNSON.
No. 1495.

Court of Appeal of Louisiana. First Circuit.
Oct. 3, 1935.

Laycock & Moyse, of Baton Rouge, for appellant.

George J. Woodside, of Clinton, for appellees.

ELLIOTT, Judge.

Drs. Toler & Toler allege that on September 14, 1933, they were called to a cotton gin in the town of Clinton operated by Dr. E. O. Munson, to attend a young man named Fritz Haven, who had received an injury so severe that the amputation of his arm was necessary without delay.

The amputation was performed by them at their clinic in Clinton, but in a few days afterwards complications set in which made necessary the removal of the young man to Our Lady of the Lake Sanitarium at Baton Rouge, at which place they re-amputated his arm. That his proper treatment made necessary the purchase of medicines, bandages, etc., the employment of nurses at Clinton and of special nurses at Baton Rouge, the calling in of a consulting physician, and an anesthetitian. That the defendant Munson agreed to pay them for their services and at the same time authorized them to incur in Fritz Haven's behalf all the expenses proper and necessary in treating his case. The value of their services is placed at $269; the bill of Mrs. B. P. Toler, trained nurse, $18; Mrs. Jackson, practical nurse, $6; bill of Our Lady of the Lake Sanitarium for rooms and hospital service, $174.39; the bill of Red Cross Drug Store for drug store supplies, amounts to $49.10; charge of physicians called in consultation, $25; that of another for administering an anesthetic, $25—the whole amounting in the aggregate to $566.-

49. Legal interest is claimed from judicial demand until paid.

Plaintiffs' personal demand is not for a sum fixed on by agreement, but is claimed as the value of their services rendered; the other bills appear to be based on the customary charge for such services and' supplies. The plaintiffs pray for judgment against Dr. Munson for the amount due them personally and for the benefit of those whom they allege have charges which he authorized them to incur in the treatment of the case.

Dr. Munson appeared in answer to their demand and filed an objection to their suit on the ground that their petition set forth no right or cause of action; but in the alternative and in case the court held that the petition did set forth a cause or right of action, he then in that event alternatively urged that it sets forth no right or cause of action in so far as concerns any items claimed as due others.

The exception was overruled, and the exception alternatively urged was by the court referred to the merits. The defendant, reserving all rights under his exceptions, then answered plaintiffs' petition. In his answer he denies being indebted to the plaintiffs; denies responsibility for the expense incurred in the treatment of Fritz Haven at Clinton and at Baton Rouge; denies that he authorized plaintiffs to remove the young man from plaintiffs' clinic at Clinton to Our Lady of the Lake Sanitarium at Baton Rouge. He admits having paid the special nurses hired by plaintiffs at Our Lady of the Lake Sanitarium, but alleges that it was done at the special request of the Mutual Benefit Health & Accident Association and for its account. In case the court holds that he did make the statement imputed to him by the plaintiffs, he, in that event, alleges that such statement would constitute a promise to pay the debt of a third person, and that inasmuch as such a promise must be in writing, no parol evidence is admissible to prove it, and that their petition sets forth no cause or right of action on that account.

After the case had been tried but before judgment had been rendered, defendant filed the prescription of one year as a bar against plaintiffs' action on the bill of Mrs. B. P. Toler and Mrs. Ella Munroe Jackson.

There was judgment **in favor of the plaintiffs as prayed for.**

Defendant has appealed. The defendant, E. O. Munson, argues that his exception of no right or cause of action should have been sustained and plaintiffs' suit dismissed on that account.

Taking the averments of the petition to be true, for the purpose of reviewing the ruling overruling the exception, the petition shows on its face that "the debt" claimed by the plaintiffs of the defendant is based on defendant's assurance "that if the Insurance Company would not pay the expenses he would do so." The name of the insurance company is not stated. The petition alleges that no insurance company has paid them nor any of the bills, alleged to have been contracted under defendant's assurance on that subject.

In article 3 of their petition they allege in effect that, upon arriving at the office of petitioners, the condition of the said Haven was critical and required an immediate amputation of his injured arm, and the said Dr. E. O. Munson being present instructed petitioners in the presence of the witnesses to spare no means to save his life, and assured petitioners that if the insurance company would not pay the expense he would do so.

In article 4 it is said that, acting on the assurances of the said Dr. E. O. Munson that he would be responsible to petitioners for necessary and reasonable expenses, petitioners immediately amputated the injured arm of the said Fritz Haven in their office, cared for him in their infirmary, employed a registered nurse and a practical nurse for him during September 14, 15, and 16, 1933, and bought the necessary drugs, bandages, etc., to properly treat his wound.

In article 5 of their petition it is said that on September 16th, the condition of the said Fritz Haven being still extremely critical, the said Dr. E. O. Munson instructed petitioners to move the said Haven to Our Lady of the Lake Sanitarium at Baton Rouge, La., to spare no expense to save his life, and to employ nurses and necessary medical consultation, if petitioners saw fit to do so, and he again assured petitioners that he would pay all such expenses in case the insurance company refused to pay them.

They allege in article 6 the removal of the young man from their clinic at Clinton to Our Lady of the Lake Sanitarium and the employment of nurses; that another physician was called in consultation, another to administer the anesthetic, the re-am-

putation of the arm, and treatment there until the injured party was in condition to be taken to his home near Clinton. The provision in our Civil Code, art. 2278, that, "Parol evidence shall not be received. * * * To prove any promise to pay the debt of a third person," was not contained in the Civil Code of 1825. It was first incorporated into our law by Act No. 148 of 1858 and is said to have been derived from what is known in England as the statute of frauds. See Ruling Case Law, vol. 25, subject, Statute of Frauds, § 62 et seq. The law contemplates a debt at the time of the promise, for the payment of which a third person is primarily liable and for which the promisor, not primarily liable, promises to pay for the primary debtor.

Defendant's argument in support of his exception assumes and supposes some insurance company not named to be already liable to plaintiffs at the time of the promise for whatever sum might become due them on account of their services, as well as for whatever further amount might become due on account of expenses, necessary in the treatment of the case, and that plaintiff had no proof, except parol evidence, to offer for the purpose of establishing his promise. Defendant's argument on the subject does not seem to take into account the fact that plaintiffs do not allege that any insurance company was ever liable to them on said account, and that they do allege that no insurance company has paid them or any of the expenses incurred. We cannot assume, for the purpose of ruling on the exception, that some insurance company as third person was liable to plaintiffs for the value of the services they were then about to render Fritz Haven, and also for the expenses which his treatment would require; but suppose that could be done, we could not then further assume for the same purpose that plaintiffs had nothing except parol evidence to offer in support of the alleged promise. A question of that kind is for determination on the trial of the merits. The exception was properly overruled, and for the same reason the exception alternatively urged against that part of plaintiffs' demand which is in behalf of others having bills or rendering services was properly referred to the merits.

When plaintiffs on the trial offered to prove against defendant his promise to pay by parol evidence, the defendant objected on the ground that parol evidence was not admissible for that purpose. The court overruled the objection, received the evidence, gave it effect, and decided the case in favor of the plaintiffs, based on the evidence received. Defendant contends that this ruling was erroneous, and urges that it be set aside and that the evidence be not given effect. A discussion of the admissibility of parol evidence to prove this alleged promise must to a large extent enter into the merits of the case.

Dr. E. M. Toler was the principal witness in behalf of the plaintiffs. Asked, what was the first steps taken after the injury, he said: "We immediately brought him to our office; his condition was critical, he was losing so much blood. We applied tourniquet on his arm and immediately got ready to amputate the arm, as we felt for safety it was better to amputate the arm. Dr. Munson came to my office and told us to spare no means for safety to the boy, to do everything possible to do, and that if the Insurance Company did not pay the bill he would. On this we proceeded to amputate the boy's arm and took care of him from the morning of the 14th to the night of the 16th and as his condition was still very critical we thought it advisable to take him to a hospital in Baton Rouge. But before we did this, we got in communication with Dr. Munson at my office and he reassured us to carry him to hospital, call any consultation necessary or that we saw fit, and he would see that we were properly reimbursed for what we would do for him. We carried him to the Lady of the Lake hospital and he told us, if necessary to get special nurses for him, and we did. I instructed them to render bill direct to Dr. Munson, as he had assured us, if the Insurance did not take care of it, he would."

Further questioned:

"Q. I want to know if you rendered services on expectation or hope for compensation from Insurance Company or whether you rendered service on expectation or assuming that you would be paid for this by Dr. Munson? (Objection made and overruled.) A. I rendered services on assurance that if the Insurance Company was not liable that Dr. Munson would settle bill. I went to the gin with that assurance. I knew nothing about the insurance when I went down and took charge of the case. I was asked to take charge of the case, the insurance question came up later. If I had been depending on the Insurance Company I never would have sent for Dr. Munson to come to the office the second time."

Cross-examined.

After having stated that Dr. Munson did not summon him to the gin, but that he had been called by somebody, supposedly his representative, he was further questioned:

"Q. Did you begin amputation immediately on the arm? A. Not before he assured us he would settle the bill. We were preparing to begin the operation anyway. Had he not come I would have gone on; I would do that for anybody.

"Q. Amputation had not been begun when Dr. Munson came? A. I think he came in while we had him on the table.

"Q. Now, just what conversation took place between you and Dr. Munson about this case? A. Dr. Munson came into the office while we were amputating or might have been just after the amputation, and he told us to spare no means or expense; employ nurses or any assistance we might see fit. He said he had insurance but if the Insurance Company did not settle, that he was liable for all debts that might be incurred for treatment in the case.

"Q. Did he volunteer that statement or did you ask for it? A. He volunteered that statement."

Defendant contends that the amputation had been already performed at the time his promise is claimed to have been made, citing the latter statement of Dr. Toler above mentioned, to the effect that Dr. Munson came into the office while we were amputating, or might have been just after the amputation, etc.

The apparent contradiction must yield to what reasonably appears was Dr. Toler's meaning, taking into account all he says on the subject. And the testimony of Dr. Munson must be taken into account, to the extent that it corroborates the statements made by Dr. Toler, that the promise was made before any service was rendered or any expenses incurred.

Dr. Toler, after answering, saying that Dr. Munson had promised to pay before any service had been rendered or expenses incurred, further answered saying that the amputation was in progress at the time or just after it had been finished; and the contradiction was not explained.

Dr. Munson was asked by his counsel:

"Q. Dr. Munson, please give in detail as far as possible what happened on the day Fritz Haven was injured, from the time you received the information concerning his injury? A. I was detained in Jackson that morning. I usually get to the town reasonably early, but I had to wait until the bank opened that morning. So when I got to the gin I did not stop at the gin but had business up town and went up town and then came back to the depot, Y & M V depot, and a gentleman there asked me how Fritz Haven was getting along, and I asked him what he meant and he told me the boy had been hurt. I immediately went over to the gin and they told me what had happened, and I went to the telephone and called up the insurance people over at Lafayette, and from the telephone office I went to Dr. Toler's office. I did not go into Dr. Toler's office; I met him standing in the doorway and delivered the message.

"Q. What message? A. The message that the representative of the Insurance Company had told me. I delivered the message to Dr. Toler.

"Q. What was said at that time about the insurance to Dr. Toler? A. I told Dr. Toler what the Insurance Company said and he told me that if the Insurance Company did not pay it I would have to pay it.

"Q. What did you tell him? A. I told him the boy was fully insured and I was satisfied the boy would be taken care of."

Cross-examined.

"Q. After telephoning to the Insurance Company what did you do? A. I went to Dr. Toler's office.

"Q. What did you tell Dr. Toler? A. I told him what the Insurance Company instructed me to tell him.

"Q. Did you tell him that the Insurance Company had instructed you to tell him that? A. Yes, Sir.

"Q. You told him that 'the Insurance Company has instructed me to tell you to spare no expense in saving the boys life'? A. No, Sir; they did not say just that.

"Q. What did you tell Dr. Toler the Insurance Company told you to tell him? A. I told Dr. Toler the Insurance Company told me to tell him to give the boy proper attention.

"Q. You did not do that on your own hook? A. I delivered Insurance Company's message.

"Q. You are positive you told him that was message from Insurance Company, and you were not involved in any way whatsoever? A. I did not go into details but delivered message from Insurance Company.

"Q. You told him message was from Insurance Company? A. Yes, Sir."

According to Dr. Munson, he went to Dr. Toler's office and met him standing in the doorway, immediately after telephoning an insurance company at Lafayette, and delivered what he says was a message from the insurance company to Dr. Toler without going into the office. Now, if the amputation had been performed at this time, Dr. Munson, in view of his contention, would likely have made some mention of that fact, in his testimony. He says instead, "I told him the boy was fully insured and I was satisfied the boy would be taken care of," indicating that Toler's service and the expense of treating the boy were the subject of discussion, but nothing indicates that at that time any service had been rendered. The message he claims to have delivered was that the insurance company had told him to tell Dr. Toler to give the boy proper attention, indicating that attention had not at that time been given him. In response to question, if he was sure he had not involved himself in some way, he says: "I did not go into details, but delivered message from Insurance Company."

The testimony of Dr. E. M. Toler was presumptively given in the presence of Dr. Munson, and if Dr. Toler's statements that he proceeded to the amputation and to authorize necessary expenses on the promise of Dr. Munson previous to the service rendered, Dr. Munson, when giving his testimony should have contradicted him, but he instead talked about other matters. This matter no doubt impressed the lower court.

Under the Civil Code, art. 1890, "A person may also, in his own name, make some advantage for a third person the condition or consideration for a commutative contract." Article 1902, "But a contract, in which anything is stipulated for the benefit of a third person," etc. And see the very plain language on the subject contained in Code of Practice, art. 35.

In Watson Bros. v. Jones, 125 La. 249, 51 So. 187, the Supreme Court said in discussing a question like the one we have in hand:

"There can be no objection to one's contracting to pay for goods to be delivered, whether to the obligor, or to a third person, and the obligation resulting from such a contract may be none the less a debt of the obligor because the third person, to whom the goods are delivered, also becomes bound for the price.

"If the condition of the contract is that the obligor is to pay for the goods only in the event that the person to whom they are to be delivered does not, then the latter is to be regarded as the principal debtor, and the contract is a collateral one, of suretyship, in which the obligor would be regarded as binding himself for the debt of another, and which could not be proved by parol evidence." Citing authorities.

With this holding we fully agree. The promise of Jones in the case just quoted had reference to a debt primarily due by a man named Pierson and the promise was to pay it only in case Pierson did not. The situation in the present case was different. There was no debt due Toler & Toler, by or for Fritz Haven, or any insurance company it does not appear that Fritz Haven was even consulted about the amputation or anything else. As for insurance, no insurance company has paid anything and there is no factual foundation for the conditional part of the promise, because there was no insurance due on account of the injury.

The cases O'Ferrall v. Nashville Bridge Co., 165 La. 963, 116 So. 399, and Wallenburg v. Kerry, 16 La. App. 221, 133 So. 823, to our mind support the admissibility of the parol evidence for the purpose of proving defendant's liability in the present case.

It is our conclusion from the evidence that Dr. Munson did not promise to pay the debt of a third person, but of himself, contracted previous to the amputation and primarily payable by him. Defendant's objection to parol evidence was in our opinion properly overruled and the evidence received and given effect for the purpose of proving the liability of the defendant.

■■■ Defendant contends that the evidence received, properly appreciated, does not establish his liability. The mere fact that Fritz Haven received the benefit of plaintiffs' services and the expenses incurred in his behalf as a result of Dr. Munson's undertaking, and the further fact that Fritz Haven is himself equitably liable therefor, do not release Munson at all, but leave him as the only person before the court liable for the debt.

We are satisfied that defendant agreed to pay plaintiffs previous to the amputation for their services and all expenses and charges as alleged in their petition.

Our conclusion on this subject is strengthened by the fact that Dr. Munson voluntarily paid the bills of the special nurses hired by the plaintiff at Our Lady of the Lake Sanitarium. Defendant explains that he paid these special nurses at the request of an insurance company and expected to be reimbursed. He did not claim as a witness that he had been reimbursed.

There is contention on the part of defendant that plaintiffs have not established their case by the testimony of one credible witness and other corroborating circumstances. We find that proof has been made by a credible witness and other corroborating circumstances, also by corroborating witnesses.

■■ There is contention on the part of defendant that plaintiffs have no right to sue him for the recovery of expenses incurred for drug store supplies, for the hire of nurses, for physicians called in consultation, and another called in to administer an anesthetic while the second operation was being performed. That bills for these items are due the parties who rendered the service and can only be claimed by them, and not by plaintiffs.

The principal is bound to accept the arrangement entered into by his agent. According to the testimony of Dr. E. M. Toler, they were authorized by Dr. Munson to secure these services; they were secured and the bills contracted pursuant to the authority vested in them by the defendant.

We take the testimony of Dr. Toler on the subject to be true. These expenses were therefore authoritatively contracted, and there is no reason why the plaintiff cannot compel the defendant to pay them; otherwise the plaintiffs themselves will be liable therefor. Defendant's refusal to pay justifies the plaintiffs in collecting them by legal process for the purpose of paying the amounts to the parties to whom they are due. Civ. Code, arts. 3021, 3022 et seq.

■ The defendant pleads the prescription of one year against Mrs. B. P. Toler and Mrs. Ella Munroe Jackson for nursing. The prescription is based on article 3534, which prescribes that limit for "servants, for the payment of their wages." The evidence shows that Mrs. B. P. Toler is a trained nurse and that Mrs. Ella Munroe Jackson is a practical nurse. More than one year elapsed after their services were rendered before the present suit was filed. The plaintiffs contend in argument that the action of the agent against his principal to obtain reimbursement for sums that he has expended in behalf of his principal is not proscribed except by 10 years, but the plaintiffs did not pay these bills; they are still due Mrs. Toler and Mrs. Jackson. Plaintiffs are not claiming reimbursement under the Civil Code, art. 3022.

We have examined the law on the subject of wages due servants; there are numerous articles of the Civil Code on that subject. For present purposes we only refer to articles 3205; 164 et seq.; 2747; 2749; 642; 3556, subd. 12. The word "servant," used in article 3534, has been held by the Supreme Court to mean "menial servant." Coote v. Cotton, 5 La. 12; Keaghey v. Barnes, 11 Rob. 139; and others to the same effect. It is with difficulty that we are able to class a trained nurse and a practical nurse as "servants'; but we feel constrained to follow the cases Mrs. Vaughn & Husband v. Terrell & Wade, 23 La. Ann. 62; Succession of Alexander, 110 La. 1027, 35 So. 273; and Succession of Fellon, 145 La. 967, 83 So. 208, on that subject.

For these reasons the judgment appealed from, to the extent that recovery is permitted on the bill due Mrs. B. P. Toler for $18 and Mrs. Ella Munroe Jackson for $6, is avoided, annulled, and set aside, and plaintiffs' action is to that extent held to be barred by the prescription of one year; but in all other respects the judgment appealed from is in our opinion correct and as amended it is now affirmed.

The cost of appeal to be paid by appellees; all other cost by appellants.