## WEBB v. SHREVEPORT PACKING CO., Inc.

### No. 5634.

Court of Appeal of Louisiana. Second Circuit.

April 1, 1938.

Rehearing Denied April 1, 1938.

Dickson & Denny, of Shreveport, for appellant.

Harry V. Booth, of Shreveport, for appellee.

TALIAFERRO, Judge.

Plaintiff, for her own account, and as the assignee of Mrs. Paul Lashley, both registered nurses, seeks judgment against defendant for 39 days' services at $6 per day, rendered to W. A. Lester, an employee of defendant, while confined in a sanitarium from the effects of being seriously gored by a bull while performing the duties of his employment.

The premise upon which the action is based is that these nurses were engaged or employed by defendant, by and through its president, S. W. Dickson, to render to its injured employee the services for which they sue.

Defendant denies liability. It denies that its said president employed or authorized the employment of the nurses, as by them alleged. Alternatively, defendant pleads that should it be found and held that its president did employ said nurses, even then no liability for their services devolved upon it for the reason that such action was unauthorized and beyond its president's powers.

Defendant appealed from a judgment for plaintiff for the amount sued for.

Lester was seriously injured. He was hurried to a sanitarium (in the city of Shreveport) and Dr. T. J. Fleming was immediately summoned. The case was intrusted to him for medical and surgical attention. It was considered a serious

one. An operation was performed as quickly as possible.

Dr. Fleming testified that Mr. Dickson came to the sanitarium before the operation was performed (Mr. Dickson admits this), and then and there instructed him "to not spare anything, consultation or whatever was needed; that he wanted him to get well if possible." He also testified that on the following morning, when it appeared as though Lester would not survive, Mr. Dickson repeated what he said the evening prior, additionally suggesting that a consultant from New Orleans be summoned. Dr. Fleming testified positively that Mr. Dickson told him that defendant would pay the bills, and pursuant to this commitment and the urgent request that nothing be spared in the patient's behalf, plaintiff and Mrs. Lashley were employed as day and night nurses to serve the injured man until he was out of danger. It is customary for the physician in charge to attend to the selection of nurses when their services are needed. Dr. Fleming's opinion of the patient's condition was such that he desired him to have the best of attention, and in keeping with this desire these two nurses were engaged in the case. Their selection reflects Dr. Fleming's estimate of their skill and ability as nurses.

The question of who would pay the nurses does not appear to have been specifically mentioned until at the expiration of the first week. It is customary for nurses to render bills for their services at the end of each week. It was then, for the first time, that, according to both nurses' testimony, Mr. Dickson assured them personally that he would be responsible for their pay and to turn the bills in to him at the end of their services; and acting upon this assurance, and at Dr. Fleming's request, neither presented bills at week-ends. They decided to wait until their services were no longer needed, feeling no misgivings about receiving their pay.

Mr. Dickson denies that he authorized Dr. Fleming to employ any one in the case and denies that he agreed, on behalf of his company, to pay for nurses' services. He gave the following testimony:

"Q. How long afterwards was it before you discussed anything about payments?

"A. Seventeen days after the accident, he got a letter from the Insurance Company.

"Q. You recall what was said then?

"A. Yes, sir, as I recall told Dr. Fleming we could not do anything, except to try and get the boy well, *and what it liked in paying, would have to pay it ourselves.*

"Q. If the insurance was not enough, have to pay it?

"A. Yes, sir." (Italics ours.)

The insurance referred to is the limit of $250 provided for in the Workman's Compensation Law, Act No. 20 of 1914, as amended, for payment of medical, surgical, and hospital expenses incurred on behalf of an injured employee.

It is quite certain that neither Dr. Fleming nor these nurses expected Mr. Dickson personally to pay any part of the expense incurred in Lester's behalf. They understood, and correctly so, we think, that the commitments made by him were in the capacity of president of his company. He evinced but a natural and a human solicitude for the injured employee's recovery. And it seems to us that because of this solicitude and his anxiety in the case, it would have been but most natural for him to have said and done exactly what Dr. Fleming testified that he did say and do. His assurance to these nurses a week after the operation is strong corroboration of Dr. Fleming's testimony. And, in addition, we have his own testimony, quoted supra, wherein he admits that he assured Dr. Fleming that if the insurance was insufficient to pay all the expenses in the case they "would have to pay it ourselves." Unquestionably "ourselves" refers to defendant company. It may be that when his first commitments were made he entertained no thought that the insurance would be insufficient to pay all these expenses, but this fact would not affect his company's individual liability for such commitments (assuming he had the power to make them), to third persons who rendered services upon the faith of such.

■ We are convinced from all the testimony in the case, and the rational inferences arising therefrom, that Mr. Dickson, acting as president of defendant company, authorized Dr. Fleming to go the limit in his efforts to save Lester's life, and that the nurses were employed under this authority. By so acting, defendant's liability to the nurses became a primary obligation, independent of any

liability therefor by any other person, if such there be. Such liability does not flow from an assumption of the debt or obligation of a third person. It flows from a primary obligation.

■ The objection to parol testimony to prove such an obligation, or the facts forming its basis, is without merit. Wallenburg v. Kerry, 16 La.App. 221, 133 So. 823.

■ And when the obligation is once established, subsequent verbal declarations of the obligor, confirmatory of his original commitment, may also be shown by testimonial proof.

As concerns the above-discussed point, and the alternative defense that Dickson was without authority to bind defendant for expenses necessary to relieve Lester's distress and restore him, if possible, to good health, we think the case of O'Ferrall v. Nashville Bridge Co., 165 La. 963, 116 So. 399, decisive. We quote two sections of the syllabi of the case which clearly reflect the court's holding anent the questions considered; viz.:

"3. Employer's contract with physician for treatment of injured employees is not affected by Civ.Code, art. 2278, declaring that parol evidence should not be received to prove promise to pay debt of third person, since employer had personal interest in saving men's lives because of possibility of being answerable in damages.

"4. Although employer has right to limit its liability for medical service to injured employees to amount allowed by Workmen's Compensation Law (Act No. 20 of 1914), § 8, as amended by Act No. 43 of 1922, it is also at liberty to extend its liability beyond what law requires."

Defendant there was engaged in constructing a steel tank near the city of New Orleans. A scaffold collapsed and precipitated seven employees 25 or 30 feet to the ground, and, as related by one witness, "the men were lying there, a mass of blood and broken bones." A. W. Woodman was defendant's consulting and constructing engineer, with office in the city. Woodman, on being advised by phone of the accident and of the seriousness of the injuries to the men, authorized the employment of plaintiff, a prominent orthopedic surgeon, to attend the men and render such professional services as their cases demanded. Woodman then wired defendant in Nashville, Tenn., briefly of the accident. Its president immediately telegraphed him, inter alia, saying, "See that men are well taken care of and kept on payroll."

Dr. O'Ferrall sued to recover the amount charged defendant for the services rendered the injured men. His demand was resisted on several grounds, among them being that defendant's representative (Woodman) had no authority to make the contract with plaintiff on which he sues. Disposing of this defense, the court says:

"Our conclusion is that the judgment appealed from is correct. There was a verbal contract between the plaintiff and the defendant's representative, John W. Evans, acting under instructions from A. W. Woodman. The telegram which Woodman exhibited to the plaintiff was ample evidence of Woodman's authority under the urgent circumstances of the case. It will not do to say that it requires a meeting and resolution of the board of directors of a corporation to authorize the employment of a physician or surgeon in an emergency, such as there was in this instance. The facts which we have recited show that the company was informed of the contract of employment and tacitly ratified it and received the benefit of it."

■ In the present case, defendant had a personal and a pecuniary interest to promote by affording Lester the sort of services he received. Should he die, his dependents would recover compensation for a long period; should he be restored to sound physical condition, liability for compensation would be terminated, and financial outlays would be much less. Such an interest serves as a valid consideration for a commitment of responsibility such as we are here dealing with. The fact that defendant was protected by compensation insurance does not alter the situation.

We are clear in the opinion that the trial judge has correctly adjudged the issues in the case, and, therefore, the judgment appealed from is affirmed with costs.