272 So.2d 430 (1973)
Charles F. DAVIS, Plaintiff-Appellant,
v.
PIONEER BANK & TRUST COMPANY et al., Defendants-Appellees.
No. 11993.
Court of Appeal of Louisiana, Second Circuit.
January 9, 1973.
*431 Lawrence L. May, Jr., Shreveport, for plaintiff-appellant.
Bodenheimer, Jones, Klotz & Simmons by J. W. Jones, Shreveport, for defendants-appellees Pioneer Bank & Sterling J. Lindsey.
Pugh & Nelson by Robert G. Pugh, Shreveport, for third party defendants-appellees H. E. Harber and L. G. Pittman.
Before AYRES, HEARD and HALL, JJ.
HALL, Judge.
This appeal is from a judgment rejecting the demands of plaintiff, Charles F. Davis, in an ex delicto action brought against defendants, Pioneer Bank & Trust Company and one of its vice presidents, Sterling J. Lindsey, seeking damages for an alleged breach of a fiduciary relationship through disbursement of funds belonging to plaintiff contrary to his instructions. We affirm the judgment of the district court.
Plaintiff's petition alleges that on October 2, 1970, he delivered to Lindsey a check payable to plaintiff and the bank in the sum of $38,807.65, with instructions to pay off his indebtedness to the bank in the amount of $32,781, with the balance to be returned to plaintiff either in cash or by deposit to his personal account in the bank. Plaintiff further alleged that Lindsey deposited the funds in a checking account *432 designated as "D. C. H. Special" and made unauthorized disbursements therefrom, wrongfully depriving plaintiff of $2,207.62, being the difference between the amount of the check and the amount due the bank plus $4,017 in outstanding checks written by plaintiff which came in after the check was delivered to Lindsey. Plaintiff itemized his damages as $5,000 for grief, anguish, humiliation and inconvenience, $10,000 for injury to his financial standing and $2,207.62 for funds of which he was deprived, or a total of $17,207.62.
Defendants answered alleging that plaintiff was a member of a partnership designated as D. C. H., that the check delivered by plaintiff was deposited into the partnership account which was overdrawn at that time in the amount of $25,731.34, that the account was debited with the total amount owed the bank of $32,781, that $4,017 in checks drawn on the account were received and paid from the account and that $800 each was paid to Dr. H. E. Harber and Dr. L. G. Pittman, two of the partners and charged to the account, all pursuant to instructions received by the bank. Defendants made a third party demand against Dr. Harber and Dr. Pittman alternatively seeking judgment against the third party defendants for any amount for which defendants might be cast in favor of plaintiff. The third party defendants denied any liability.
After trial the district court rejected plaintiff's demands which necessarily carried with it a rejection of the third party demand. Plaintiff appealed. The bank and Lindsey, as third party plaintiffs, neither appealed nor answered plaintiff's appeal so their third party demand is not before this court.
On appeal, plaintiff contends the bank and its vice president breached their fiduciary duty to him by depositing the entire amount of the check delivered to them in the D. C. H. Special account rather than paying the indebtedness due by plaintiff and returning the balance to him and by disbursing funds out of the D. C. H. Special account without proper authority.
In April, 1970, plaintiff, Dr. Harber, Dr. Pittman and Bill Calvert entered into a business enterprise for the construction and sale of "235" houses. Initially, three lots were to be purchased with Dr. Harber and Dr. Pittman to provide the funds necessary to purchase the lots. Calvert was to provide the interim financing for the construction of the homes through arrangements with Modern American Mortgage Company by whom he was employed at that time. Davis, a builder, was to construct the homes and find qualified applicants to purchase them.
There was no written agreement between the parties. It is clear that the profits of the venture were to be divided between the parties, but there is a conflict in the testimony as to the percentage each was to receive. Plaintiff testified he was to receive seventy-five per cent and the other parties were to divide the remaining twenty-five per cent. Drs. Harber and Pittman both testified plaintiff was to receive fifty per cent and the other fifty per cent was to be divided among the remaining parties.
Following their agreement to enter into the construction venture, Dr. Harber went to Pioneer Bank and made arrangements with Lindsey to borrow $6,000 to purchase the three lots and signed a note for that amount. The proceeds of the loan were deposited in a new checking account designated as D. C. H. Special account. A subsequent note was signed by Dr. Harber for $510 to give the venture additional funds for expenses and the proceeds of this loan were also deposited in the same account. The signatures of any two of the three members of the venture whose initials were included in the account designation (Davis, Calvert and Harber) were required to draw checks on the account.
The lots were purchased in the name of Davis. Shortly thereafter, Calvert, who was to be responsible for the interim financing *433 and keeping the books on the project, had to relinquish these responsibilities because he was relieved of his employment with Modern American Mortgage Company and he dropped out of the venture. From this point on, Dr. Harber and Dr. Pittman were responsible for the interim financing and Dr. Harber also served as the bookkeeper for the group. The bank provided the interim funds by allowing overdrafts on the D. C. H. Special account. All construction expenses were paid out of this account. Three notes in the amount of $15,000 each were executed by Davis, secured by mortgages on the three lots, and delivered to the bank as collateral security. The bank also held a blank note signed by Dr. Harber and Dr. Pittman as additional collateral security.
During the course of construction Davis drew approximately $100 per week for his expenses which was paid out of the D. C. H. Special account. Davis testified this drawing account was to be in addition to his percentage share of the profits. Dr. Harber testified that Davis' drawing account was to be deducted from or credited against his share of the profits. The evidence also shows that Davis received down payments from the purchases of the three lots totaling $600 which he never deposited to the D. C. H. Special account.
The evidence also shows that the construction of the three homes took an unusually long time and that toward the end of the project Dr. Harber went to the construction sites almost daily in an effort to speed up completion of construction. Although Davis found two purchasers, the third purchaser was Dr. Pittman's maid. It is clear that all three, Davis, Harber and Pittman, contributed actively to the business venture in all of its aspects.
The sale of all three lots was closed on October 2, 1970, in the office of Davis' attorney, Leroy Scott. Scott called the Pioneer Bank late on Friday afternoon to get a payoff figure on the three interim mortgages. Lindsey advised Scott that he could not work up a payoff figure at that time and to make the check for the proceeds payable to Davis and the bank. Davis and Scott brought the check for $38,807.65 to Lindsey who in turn delivered the three mortgage notes to Scott so that the closing could be completed and the interim mortgages canceled.
Davis testified that he gave Lindsey specific instructions to use the check to pay off the indebtedness to the bank and to return the balance to him either in cash or by deposit to his personal account at the bank. Lindsey denied that Davis gave him any such instructions. Scott could not recall hearing any special instructions being given to Lindsey although it was his impression that the funds were being delivered to the bank to pay the interim financing. Lindsey told Davis to come back the following week at which time he would have the final figures available.
Lindsey deposited the proceeds of the check into the D. C. H. Special account. At that time, the account was overdrawn $25,731.34. Lindsey debited the account for an additional amount of $7,051.34 representing repayment of the $6,510 loaned by the bank initially, plus interest. Within the next few days checks totaling $3,528.03, signed by Davis and Harber, drawn on the D. C. H. Special account in payment of the construction costs were received and paid out of the account. Several additional checks totaling approximately $900, signed only by Dr. Harber, were drawn on and charged to the account. At the request of Dr. Harber, Lindsey debited the account in the amount of $1,600 and issued money orders to Dr. Harber and Dr. Pittman in the amount of $800 each. The total charges against the account were substantially equal to the amount of the check deposited.
Davis returned to the bank on two or three occasions during the week following delivery of the check to Lindsey and was ultimately advised of the disposition of the proceeds of the check as outlined above. This suit ensued.
*434 On the factual question of what instructions, if any, were given by plaintiff to Lindsey at the time the check was delivered, we cannot conclude that Lindsey was specifically instructed to pay the indebtedness due the bank and return the balance to Davis. Lindsey's testimony is to the contrary and his version is corroborated to some extent by the testimony of Scott. We doubt that Lindsey would have accepted any such instructions in view of his knowledge of the arrangement between Davis, Harber and Pittman. Such instructions would assume that the money belonged to Davis personally, which we find not to be the case.
Although plaintiff contends that the only relationship of the doctors to him was that of interim financier, we find that, in fact and law, a partnership existed between the parties. The parties' agreement evidences a sharing of the profits, losses, control and ownership of the property involved in the construction venture. Thus, the essential characteristics of a partnership as defined by our jurisprudence existed in this arrangement. Sas Jaworsky v. LeBlanc, 239 So.2d 176 (La.App.3d Cir. 1970); Pertuit v. LeBlanc, 240 So.2d 777 (La.App.2d Cir. 1970).
It follows that the proceeds of the sale of the houses, which must be considered as partnership property even though title was in the name of Davis, belonged to the partnership. Lindsey's action in depositing the partnership funds into the partnership account was entirely proper, particularly in view of the substantial overdraft which needed to be covered and in view of his knowledge of the other partners' proprietary interest in the funds.
The deposit contract made at the time the account was opened, provided that the signatures of two of the partners were required on each check. Nevertheless, the bank honored checks in the amount of approximately $900, drawn on the account and signed only by Dr. Harber. In addition, Lindsey caused the account to be debited for $1,600, paid to Dr. Harber and Dr. Pittman on the instructions of Dr. Harber alone. The action of the bank in honoring these checks and paying the amounts to the two doctors was clearly contrary to the depositor's instructions. In this respect, the bank breached its duty to the depositor, namely, the partnership entity. However, the partnership and not one of its partners individually, would be the proper party to assert any claim the partnership might have arising out of this breach. The bank breached no duty owed to Davis individually.
As long as the partnership exists and has not been dissolved or liquidated, it alone can maintain an action on a partnership claim. A partner cannot, in his individual capacity, bring suit to recover a debt or damages owed to the partnership. State v. Morales, 256 La. 940, 240 So.2d 714 (1970); Trappey v. Lumbermen's Mutual Casualty Co., 229 La. 632, 86 So.2d 515 (1956); E. B. Hayes Machinery Co. v. Eastham, 147 La. 347, 84 So. 898 (1920); Modicut v. Rist, 98 So.2d 268 (La.App. 1st Cir. 1957); Coast v. Hunt Oil Co., 195 F.2d 870 (5th Cir. 1952).
A great deal of evidence was adduced at the trial of this case relating to a settlement of accounts between plaintiff and the other partners. The doctors claim that plaintiff has already received more than he is entitled to. Plaintiff claims that he has money coming out of the profits of the venture. This is not an appropriate action in which to settle and liquidate the affairs of the partnership. This suit illustrates one of the underlying reasons behind the rule that a partner cannot sue individually on a debt owed to the partnership prior to its dissolution and liquidation in that often, as here, it is impossible to determine the partner's interest in the particular obligation owed the partnership.
On the evidence introduced in this case, it is impossible to determine what loss, if any, plaintiff individually sustained as a result *435 of the disbursement of the partnership funds without the signatures of two of the partners as stipulated in the deposit agreement. It might be well to note also that the evidence does not support a finding that the actions of the bank and its officer caused plaintiff any damages for humiliation, loss of financial standing or the like.
In any event, any obligation owed by the bank and its officer arising out of these circumstances is owed to the partnership. Plaintiff, suing ex delicto in his individual capacity, cannot recover from the bank or its officer.
For the reasons assigned, the judgment of the district court rejecting plaintiff's demands is affirmed, at plaintiff-appellant's cost.
Affirmed.