**MERCO MANUFACTURING, INC.,**

v.

**J. P. McMICHAEL CONSTRUCTION CO., a partnership composed of J. P. Mc-Michael and Julia A. McMichael Dahlberg; and East Texas Fabricated Steel, Inc.**

**Civ. A. No. 16477.**

United States District Court,
W. D. Louisiana,
Shreveport Division.

Jan. 14, 1974.

OPINION

W. Gene Carlton, Shuey, Smith & Carlton, Shreveport, La., for plaintiff.

Sidney E. Cook, Cook, Clark, Egan, Yancey & King, Shreveport, La., for defendant J. P. McMichael Construction Co.

DAWKINS, Senior District Judge.

This diversity contract action initially was commenced by Merco Manufacturing, Inc., a Texas corporation, against J. P. McMichael Co., a Louisiana partnership, to collect payment for steel decking furnished under an alleged contract between them. McMichael, contending that its *only* contract was with East Texas Fabricated Steel, Inc., not Merco, requested that East Texas be joined as a necessary party defendant under F.R. Civ.P., Rule 19(a). Despite Merco's objection, we ordered East Texas joined as a party defendant; and, after East Texas failed to respond, a default was entered by the Clerk of Court pursuant to F.R.Civ.P., Rule 55(a).

Only after trial and submission did we discover that joinder of East Texas, a Texas corporation, destroyed diversity jurisdiction.[1] But this defect was not fatal since we now hold that East Texas's ultimate interests coincide more with those of Merco than McMichael. Consequently, we conclude East Texas should be realigned as a party plaintiff.[2] This obviates a determination as to whether East Texas is an indispensible party, which could not be dropped to restore jurisdiction, a matter as to which we reserve judgment.[3]

1. 28 U.S.C. § 1332(a)(1); Strawbridge v. Curtiss, 3 Cranch 267, 2 L.Ed. 435 (1806).

2. This determination will be discussed later, inasmuch as a full understanding of the contractual relationships between the parties, the *primary* issue in dispute here, is necessary to discussion of the *ultimate* interests of the parties, and their proper alignment.

3. F.R.Civ.P., Rule 19(b) provides: "If a [necessary party under 19(a)] cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensible." A host of decisions hold that joint obligors in a contract action are not indispensible parties; *see, e. g.*, Camp v. Gress, 250 U.S.

308, 39 S.Ct. 478, 63 L.Ed. 997 (1919); R. P. Farnsworth & Co. v. Globe Marble & Granite Corp., 250 F.2d 636 (5th Cir., 1959); whereas joint obligees are indispensible; *see, e. g.*, Bry-Man's, Inc. v. Stute, 312 F.2d 585 (5th Cir., 1963); Purcel v. Wells, 236 F.2d 469 (10th Cir., 1956). *See also,* Federal Practice and Procedure § 1613 (Wright & Miller); Moore's Federal Practice, Vol. 3A, 19.11 (1972). This approach poses a problem here since, as will be explained, we have a type of tripartite contractual relationship between the parties known to Louisiana Civil Law as a *stipulation pour autrui*, or third party beneficiary contract. Therefore, East Texas is a joint obligor with McMichael, as well as a joint obligee with Merco. *See* Smith, "Third Party Beneficiaries in Louisiana: The Stipula-

## CONTRACTUAL RELATIONSHIPS OF THE PARTIES

September 12, 1969, J. P. McMichael Co. entered into an agreement,[4] with Bingham-Willamette Company to act as general contractor upon construction of the latter's new manufacturing plant in Shreveport, Louisiana. McMichael then entered upon a subcontract[5] with East Texas, September 15, 1969, to furnish and erect most of the steel building materials required in construction of the plant, with the exception of metal decking, which it was to "furnish only."

Regarding such steel decking, East Texas entered into negotiations with Merco, a manufacturer of decking, to purchase the roof deck and have it delivered to Bingham-Willamette's Shreveport job site. In order to induce Merco to sell on credit, East Texas agreed to arrange for McMichael to make payment, under the subcontract, for furnishing the decking, *jointly* to Merco and East Texas. This gave Merco a joint right to payment for decking supplied under the subcontract between East Texas and McMichael, hence, a means of being assured of payment under its contract with East Texas.

McMichael and East Texas executed a signed letter agreement[6] September 24, 1969, agreeing to this. A copy of this agreement was sent to Merco, which thereafter delivered the decking. Subsequently, McMichael issued its check in accordance with its agreement. This was endorsed by East Texas and delivered to Merco. But, payment was stopped by McMichael because of its discovery of alleged defects in the paint on the decking. This litigation followed.

---

tion Pour Autrui," 11 Tul.L.Rev. 18, 56 (1936). Note, however, there has been criticism of the tendency of courts to categorize in cases like this; James, "Necessary and Indispensible Parties," 18 U.Miami L.Rev. 68, 84 (1963); and the thrust of the 1966 revision of Rule 19 was to replace the use of conclusory labeling with a logical analysis of each case.

Federal Practice and Procedure § 1613, p. 127 (Wright & Miller 1972): "A joinder issue often arises in actions in which there are third-party beneficiaries to the disputed contract. In cases in which the beneficiary is a party [to the action], the courts uniformly reject the argument that all of the original parties to the contract must be joined." [Citing: Sandobal v. Armour & Co., 429 F.2d 249 (8th Cir. 1970); Capital Fire Insurance Co. of Cal. v. Langhorne, 146 F.2d 237 (8th Cir. 1945); Rush & Halloran, Inc. v. Delaware Valley Fin. Corp., 180 F. Supp. 63 (D.C.Pa.1960); Mahoney v. Bethlehem Engineering Corp., 27 F.Supp. 865 (D.C.N.Y.1939).] It would be no valid distinction under Louisiana law that a beneficiary is not considered a party to the contract since he, nevertheless, has a separate right of action. *See*, Smith, *supra*, at 33.

4. "Standard Form of Agreement Between Owner and Contractor" of the American Institute of Architects.

5. "Standard Form of Agreement Between Contractor and Subcontractor" of the American Institute of Architects.

6. "September 24, 1969
 J. P. McMichael Construction Co.
 P. O. Box 1462
 Shreveport, Louisiana
 Re: Bingham-Willamette
 Shreveport, Louisiana
 Gentlemen:
 In reference to our contract for the above captioned project, we have signed a contract with Merco Manufacturing, Inc. in the amount of $17,109.50. When you are billed for roof deck, please make the check payable to East Texas Fabricated Steel, Inc. and Merco Manufacturing Co.
 Please acknowledge receipt of this letter and return one copy to Merco Manufacturing Co. —P. O. Box 4110, Station 'A'—Dallas, Texas 75208.

Thank you for your cooperation.
Sincerely yours,
[s] Richard Bailey
 East Texas Fabricated Steel, Inc.
 Richard Bailey—President
"cc: Merco Manufacturing, Inc.
 [s] J. P. McMichael
 J. P. McMichael Construction Co."
According to the testimony of J. P. McMichael, letter agreements such as this are common to the construction industry, since many small subcontractors do not have good credit. In fact, McMichael had told Bailey he would make all checks payable to East Texas and its suppliers. This arrangement assured the supplier that it would get paid. It also protected the general contractor against filing of liens by materialmen against the building.

Merco contends primarily that it negotiated a contract *through* East Texas *with* McMichael to furnish roof decking; and, that it has performed its obligation and now is entitled to payment from McMichael. McMichael contends initially that its only contract was with East Texas, not Merco; hence, there is no privity of contract between it and Merco; and, therefore, no obligation on McMichael's part to pay Merco. We disagree. It is our view that Merco's contract to sell roof decking was with East Texas, not McMichael. All of its negotiations were with East Texas and there is no evidence that East Texas ever acted as its agent or that McMichael ever intended to contract directly with Merco.

Nonetheless, Merco does have a right of action against McMichael, since it was the beneficiary of an arrangement which Louisiana Courts label as a *stipulation pour autrui* (third party beneficiary contract), created by McMichael and East Texas in the letter agreement of September 24, 1969 (quoted above, fn. 6).

Louisiana Revised Civil Code, Article 1890, forms the basis of Louisiana's *stipulation pour autrui*:

"A person may also, in his own name, make some advantage for a third person the condition or consideration of a commutative contract, or onerous donation; and if such third person consents to avail himself of the advantage stipulated in his favor, the contract can not be revoked."

A *stipulation pour autrui* requires intent on the part of the promisor to confer a benefit on the beneficiary, although such intent need not be motivated by generosity. It may be determined, although not agreed upon expressly, from the factual relationship of the parties. Professor J. Denson Smith, now retired, late a Professor of Law,

Louisiana State University Law School, "Third Party Beneficiaries in Louisiana: The Stipulation Pour Autrui," 11 Tul.L.Rev. 18, 24 (1936). The objective of creating an advantage for the third person also need not be express, but it may be implied from a consideration of the whole contract in light of the surrounding circumstances. Allen & Curry Mfg. Co. v. Shreveport Waterworks Co., 113 La. 1091, 37 So. 980, 984 (1905).

In typically enlightening style, Smith said:

"In fine, in undertaking to determine whether an advantage for a third party has been provided by a contract between others, the following factors are important: (1) the existence of a legal relationship between the promisee and the third person involving an obligation owed by the promisee to the beneficiary which performance of the promise will discharge; (2) the existence of a factual relationship between the promisee and the third person, where, (a) there is a possibility of future liability either personal or real on the part of the promisee to the beneficiary against which performance of the promisee will protect the former; (b) securing an advantage for the third person may beneficially affect the promisee in a material way; (c) there are ties of kinship or other circumstances indicating that a benefit by way of gratuity was intended." Smith, "Third Party Beneficiaries in Louisiana: The Stipulation Pour Autrui," 11 Tul.L.Rev. 18, 58 (1936).

Applying these factors, it indeed is plain that East Texas intended to make a stipulation in favor of Merco a condition of its subcontract with McMichael. First, there was a legal relationship between Merco and East Texas in the form of a conditional contract to sell,[7]

---

7. The existence of such a contract is evidenced by a price-quantity quotation by Merco on September 10, 1969, conditioned upon approval by its credit department. Testimony of Merco's Bedard and Beeman indicates

a rejection of this offer by East Texas and a counter-offer which was accepted by Merco, conditioned upon execution by East Texas of an agreement with McMichael specifying joint payment to Merco and East Texas

where the obligation of East Texas to pay Merco for the roof decking would partially be discharged by McMichael's payment jointly to Merco and East Texas. Next, securing an advantage for Merco in the form of joint right to payment under the subcontract with McMichael beneficially affected East Texas in a material way since it induced Merco to sell to it on credit.

McMichael expressly approved this amendment of the subcontract, which made an advantage for Merco, when it signed the letter agreement (fn. 6, supra,) through J. P. McMichael. This was done pursuant to a previous arrangement with East Texas to make all checks payable to East Texas and its suppliers, and was acknowledged by McMichael as being a common practice in the construction industry to assure payment of suppliers and hence protect contractors from the possibility of materialmen's liens against the building.

This commonly is known as the creditor-beneficiary situation where a vendee (McMichael) discharges its obligation to the vendor (East Texas) by paying the vendor's creditor (Merco). Although similar to a promise to pay the debt of another, it is not subject to the same requirements of form since there is an exchange of equivalents between the promisor and the promisee. Drs. Toler & Toler v. Munson, 163 So. 189 (La.App., 1st Cir. 1935) modified in another respect 184 La. 895, 168 So. 93; Kusin v. Miller, 199 So. 457 (La.App., 2nd Cir., 1940). Where the creditor accepts the stipulation, he makes available, by way of additional security, the promise running to the promisee. Smith, supra, at 34, n. 70.

 In a stipulation pour autrui the beneficiary never is a party to the contract. The promise (by McMichael) instead runs to the promisee (East Texas) in favor of the third party (Merco); hence, there never is a requirement that

consideration flow from the third-party beneficiary to the promisor. Smith, supra, at 33 and 51. As to the promisee, La.C.Code, art. 1890, speaks of the advantage for a third person being made the "condition or consideration of a commutative contract," that contract presumably supplying the exchange of equivalents between the promisor and promisee necessary to support the promise. As used in art. 1890, "condition" was not meant as a future and uncertain event but rather was used "in the sense of a 'charge' or 'provision' imposed upon or making part of a contract or donation." Smith, supra, at 23.

This is exactly what transpired here when East Texas and McMichael amended the payment provisions of their subcontract, thereby creating an advantage in favor of Merco as a "condition" of the contract. The consideration necessary to support McMichael's promise is furnished by the obligation by East Texas under the subcontract to furnish necessary metal decking, in order for McMichael to perform under its contract with Bingham-Willamette.

Although not a party to the contract, Merco, as third party beneficiary, has an independent right of action against McMichael to enforce the promise. First State Bank v. Burton, 225 La. 537, 73 So.2d 453, 456 (1954), decided by the Louisiana Supreme Court, held: "And then, as though to preclude any doubt as to the right of such third person to pursue a cause of action as to the advantage so stipulated in his favor, he not being a party to the contract, the Code of Practice, in Article 35, provides a remedy in the nature of an equitable action. That article reads:

'An equitable action is that which does not immediately arise from a contract, but from equity, in favor of a third person, not a party to it, and for whose benefit certain stipulations have been made; thus, if one stipulated in a contract entered into with an-

under the subcontract. East Texas sent a purchase order to Merco September 24, 1969, confirming the contract, and on the

same date executed the letter agreement with McMichael, satisfying the condition of the contract.

other person, and as an express condition of that contract, that this person should pay a certain sum on his account, or give a certain thing to a third person, not a party to the act, that third person has an equitable action against the one who has contracted the obligation, to enforce the execution of the stipulation.' "

Professor Smith explains that Article 35 is based upon the Roman theory of *actio utilis* and does not refer to equity in the British Chancery sense. "Consequently, the equitable action here referred to is not to be taken as meaning that the beneficiary has an action 'in equity' as opposed to an action 'at law' in the common law sense." *Smith, supra* at 24. Although the La.Code of Civil Procedure (superseding the Code of Practice) did not incorporate Article 35, there is little or no question that a third-party beneficiary continues to have a separate right of action.

■■ It matters not that Merco never expressly accepted the stipulation in its favor since there never was an attempt by McMichael and East Texas to revoke it. (McMichael's stopping payment on the check was *not* an attempted revocation. This was done merely because of a quality complaint.) It is settled, we think, that the beneficiary's right arises immediately upon execution of the contract, and express "consent" by the beneficiary to avail itself of the advantage is necessary only to make the right indefeasible. *See* Oliver v. Lake, 3 La.Ann. 78 (1848); Bonnafe v. Lane, 5 La.Ann. 225 (1850); Sintes v. Commerford, 112 La. 706, 36 So. 656 (1904); Mutual Life Insurance Co. v. Houchins, 52 La.Ann. 1137, 27 So. 657 (1899); Fi-

delity-Phenix Fire Ins. Co. of New York v. Forest Oil Corp., 141 So.2d 841 (La. App. 4th Cir. 1962). *See also Smith, supra,* at 55. *Cf.* Sherwood v. New York Life Ins. Co., 166 La. 829, 118 So. 35 (1928). *But see* Citizens' Bank v. Miller, 44 La.Ann. 199, 206, 10 So. 779, 781 (1892); Vosburg v. Fed. Land Bank of N. O., 172 So. 567 (La.App. 2d Cir. 1937).

In any event, it seems clear that Merco manifested its assent to the stipulation when it delivered steel decking pursuant to its contract with East Texas. This was contingent upon execution of the stipulation in its favor.

■■ Civil law does not require an express acceptance by the beneficiary, and it may be implied from contemporaneous and surrounding circumstances. Vinet v. Bres, 48 La.Ann. 1254, 20 So. 693 (1895); Mallett v. Thibault, 212 La. 79, 31 So.2d 601 (1947). Moreover, mere initiation of this action to enforce its claim is sufficient manifestation of "consent" by Merco to make the promise irrevocable. Twichel v. Andry, 6 Rob. 407 (La.1844); Vinet v. Bres, 48 La. Ann. 1254, 20 So. 693 (1895); Andrepont v. Acadia Drilling Co., 255 La. 347, 231 So.2d 347 (1969).

There are a number of early Louisiana decisions [8] containing language indicating that a stipulation, such as was executed here, does not amount to a *stipulation pour autrui,* inasmuch as a promise to pay the vendor's creditor is an advantage for the vendor-promisee, rather than for the third party creditor-beneficiary. This was engendered by a questionable use of Pothier's writings [9] in Tiernan v. Martin, 2 Rob.

---

8. Tiernan v. Martin, 2 Rob. 523 (S.Ct.La., 1842); People's Homestead Ass'n v. Garland, 107 La. 476, 31 So. 892, 893 S.Ct.La., 1902); Allen & Curry Mfg. Co. v. Shreveport Waterworks Co., 113 La. 1091, 37 So. 980 (S.Ct.La., 1905); Baker v. Bowie Lumber Co., Ltd., 151 La. 598, 92 So. 129 (S.Ct. La., 1922); Campti Motor Co., Inc. v. Jolley, 120 So. 684, 686 (La.App. 2d Cir., 1929); State v. H. D. Foote Lumber Co., 135 So. 769, 772 (La.App. 2d Cir., 1931); Freedman

v. Ratcliff, 183 La. 1, 162 So. 783, 785 (S. Ct.La., 1935); Moriarty v. Weiss, 196 La. 34, 198 So. 643 (S.Ct.La., 1940); Mallet v. Thibault, 212 La. 79, 31 So.2d 601 (S.Ct.La., 1947).

9. The Court quoted the following passage from Pothier:
"To stipulate that anything shall be delivered or paid to a third person designated by the agreement is not to stipulate for

523 (La.1842), where the Court held that assumption by the vendee of the mortgaged property of his vendor's indebtedness to the mortgagee "is not properly a stipulation pour autrui, for it is for the exclusive benefit of [the vendor]." Id. at 525. *Tiernan* and the cases inadvertently [10] employing its language strongly have been criticized by *Smith* [11] who explains "that there is nothing conflicting in the finding of an intention to make a stipulation *pour autrui* coupled with an intention to stipulate on one's own behalf; that there is nothing conflicting in the presence of a contemplated advantage for a third person in a contract which will enure also to the benefit of the promisee." *Smith, supra,* pp. 24–25. Notwithstanding *Tiernan* and its progeny, the right of a creditor beneficiary, such as Merco, to recover from an assuming vendee such as McMichael, is not open to question. Flower v. Lane, 6 Mart. (N.S.) 151 (1827); Myers v. Perry, 1 La.Ann. 372

(1846); Muntz v. Algiers & G. Ry., 114 La. 437, 38 So. 410 (1905); People's Bank v. Shreveport Ice & Brewing Co., 142 La. 802, 77 So. 636 (1918); Snelling & Snelling v. Delta Data Service, 259 So.2d 446 (La.App. 4th Cir., 1972); *Smith, supra,* at 32.

## REALIGNMENT OF EAST TEXAS

Having established the contractual relationships of the parties, we turn finally to the threshold issue of aligning the parties properly for diversity jurisdiction purposes. The governing principles of realignment are set out succinctly by the Supreme Court in Indianapolis v. Chase National Bank, 314 U.S. 63, 69, 62 S.Ct. 15, 17, 86 L.Ed. 47 (1941):

"To sustain diversity jurisdiction there must exist an 'actual,' 'substantial,' controversy between citizens of different states, all of whom on one side of the controversy are citizens of different states from all parties on

---

another. For instance, if I contract to sell you an estate for a thousand pounds, which it is agreed shall be paid to Peter, it is not for you, but for myself, that I make this stipulation. Peter is only introduced into the agreement as a person to receive the money for me and in my name, and is what the Roman jurists call *adjectus solutionis gratia.*" Oeuvres de Pothier I (Merlin, 1930) n. 57, p. 18, as translated in Allen & Curry v. Shreveport Waterworks Co., 113 La. 1091, 37 So. 980, 985 (S.Ct.La., 1905).

When read in context, it is clear that Pothier was referring only to a situation where the third person is a mere agent of the promisee receiving payment for the promisee rather than himself. The *adjectus solutionis gratia* of the Roman law referred to was a person appointed by a stipulator to receive payment for him. Buckland, A Manual of Roman Private Law, (1928) 265, § 102. *Smith* explains that Pothier merely was illustrating one situation where a stipulation of payment to a third person would not be a *stipulation pour autrui.* "[T]his must not be taken as meaning that the Romans believed that a creditor could not be the *beneficiary* of a stipulation made by his debtor for the purpose of effecting the satisfaction of his obligation. . . . Of course, no third party beneficiary contract is involved where a creditor appoints another merely to receive payment for him. But the

Romans recognized that where a party stipulated for payment to his creditor in discharge of his own obligation, such third party was more than a mere appointee to receive for the stipulator." *Smith, supra,* at 25–26.

10. In several decisions which relied upon *Tiernan,* such was unnecessary since the Court already had ruled that the requisite intent for a stipulation *pour autrui* was lacking. *See* People's Homestead Ass'n v. Garland, *supra* note 8; Campti Motor Co., Inc. v. Jolley, *supra* note 8; State v. H. D. Foote Lumber Co., *supra* note 8. And in Freedman v. Ratcliff, *supra* note 8, and Moriarty v. Weiss, *supra* note 8, after quoting the statement from *Tiernan,* that stipulations of the creditor-beneficiary variety are not *pour autrui* because they are for the exclusive benefit of the vendor-promisee, the Court follows with the inconsistent proposition that, if the third party accepts the stipulation, he may enforce it. This indeed is inconsistent, since the party cannot have a power of acceptance and a right of action thereupon unless the stipulation is *pour autrui* within the meaning of La.C.Code art. 1890. Hence, it appears the reliance upon *Tiernan* was inadvertent.

11. *Smith, supra;* Smith, "Work of the Louisiana Supreme Court, 1946–1947," 8 La.L. Rev. 227 (1947).

the other side. Diversity jurisdiction cannot be conferred upon the federal courts by the parties' own determination of who are plaintiffs and who defendants. It is our duty, as it is that of the lower federal courts, to 'look beyond the pleadings and arrange the parties according to their sides in the dispute.' Litigation is the pursuit of practical ends, not a game of chess. Whether the necessary 'collision of interests', exists, is therefore not to be determined by mechanical rules. It must be ascertained from the 'principal purpose of the suit', and the 'primary and controlling matter in dispute.' " [Cases omitted.]

Our task here, therefore, has been hindered by failure of East Texas to file pleadings, yet aided by a perspective gained during trial of the case. "Although questions of alignment are determined initially from the pleadings, [it is not unusual for] the subsequent course of litigation [to] reveal more clearly the position of the various parties and cast light on how they should have been originally aligned." Wright, Law of Federal Courts § 30, p. 97 (1970). As previously stated, it is our conclusion that East Texas should be realigned as a party plaintiff, resulting in preservation of jurisdiction.

In a case such as this, where the interest of a party is in accord with those of the defendant, in some aspects, and plaintiff in others, a more complex task is presented in ascertainment of the ultimate interests of the litigants, so as to align together those with the same ultimate interests. As commanded by Indianapolis v. Chase National, *supra,* we first must determine the "primary and controlling matter in dispute," thereafter aligning the parties according to their ultimate interest in its determination.

The primary issue here is whether Merco had a right of action against McMichael for payment of money due for metal roof decking. As to this, the interests of East Texas, as a practical matter, are in accord with those of Merco, since determining that Merco has a right of action as a creditor-beneficiary of a *stipulation pour autrui* provides it with another, and additional, debtor in McMichael. Gay v. Blanchard, 32 La.Ann. 497 (La.1880); Rhys v. Moody, 163 La. 1039, 113 So. 367 (1927); Simon v. McMeel, 167 La. 243, 119 So. 35 (1928); Isaacs v. Van Hoose, 171 La. 676, 131 So. 845 (1930). If Merco is successful in its claims for payment against McMichael for the roof decking, such will enure toward discharging East Texas's obligation to pay Merco under its contract, since a creditor-beneficiary is entitled to but one payment. Gay v. Blanchard, *supra*; Rhys v. Moody, *supra*; Simon v. McMeel, *supra*; Isaacs v. Van Hoose, *supra*. Surely it makes sense that East Texas has an interest coincidental with Merco in enforcement of the stipulation in Merco's favor, since East Texas was the stipulator-initiator of the agreement for Merco's benefit. Indeed, the analysis suggested by Smith, as to the legal and factual relationships between Merco and East Texas, previously quoted, in determining whether a *stipulation pour autrui* was intended, emphasizes that enforcement of the stipulation in Merco's favor enures to the benefit of East Texas as well as Merco.[12]

The position taken by a party during litigation may be considered in determining how he originally should have been aligned. Reed v. Robilio, 376 F.2d 392 (6th Cir., 1967); Green v. Green, 218 F.2d 130, 144 (7th Cir., 1954) cert. denied 349 U.S. 917, 75 S.Ct. 606, 99 L.Ed. 1250; B. J. Van Ingen &

12. In Rush & Halloran, Inc. v. Delaware Valley Financial Corporation, 180 F.Supp. 63 (E.D.Penn., 1960), an action by a third party beneficiary against the promissor, the Court apparently assumed there was no question that, if joined, the promisee should be aligned as a plaintiff with the beneficiary. The Court went to some lengths to find the promisee not to be an indispensible party, since joinder of the promisee as a party plaintiff would defeat diversity jurisdiction.

Co., Inc. v. Burlington County Bridge Comm., 83 F.Supp. 778–789 (D.C.N.J. 1949); Hellenthal v. John Hancock Mut. Life Ins. Co., 30 F.2d 997, 998 (D.C. Wash.1929).

Although, as noted, we do not have the benefit of pleadings or brief by East Texas, the position taken by Merco in its pleadings are helpful in determining that there was no real "antagonism" [13] between Merco and East Texas. Even after complying with an order to join East Texas as a party defendant, Merco prayed for relief solely against Mc-Michael; and, with respect to East Texas, prayed only that the Court find that it had no interest in the money owed for metal decking.

Although under Louisiana law East Texas and McMichael are co-debtors of Merco, Gay v. Blanchard, *supra*; Rhys v. Moody, *supra*; Simon v. McMeel, supra; Isaacs v. Van Hoose, *supra*, East Texas at the same time is a co-creditor of McMichael together with Merco. Isaacs v. Van Hoose, *supra*; Tennent v. Caffrey, 170 La. 680, 129 So. 128 (1930); Cucullu v. Walker, 16 La. Ann. 198 (1861). Therefore it is necessary to examine the thrust of this action to determine the dominant posture of East Texas here. Since East Texas apparently recognized, and was willing to perform, its obligation to pay Merco, as illustrated by its endorsement and delivery of McMichael's check to Merco, Merco's real grievance here is against McMichael, not East Texas. As illustrated by its complaint, (even though

we are sure it knew nothing of La.Civ. Code art. 1890, or the civilian term *"stipulation pour autrui,"*) Merco apparently chose to act only upon its right of action created by the third party beneficiary contract, not upon its contract with East Texas. Moreover, considering that the stipulation provided for *joint* payment to East Texas and Merco further supports our conclusion that, in seeking to enforce it, East Texas and Merco should be aligned together against McMichael.[14]

No genuine problem is presented as to the parties being realigned following trial, since a court may cure a defect in its subject matter jurisdiction at any time. Wright, Law of Federal Courts § 69, p. 292. In Reed v. Robilio, *supra*, the parties were realigned at the appellate level to sustain jurisdiction. As noted, often it is only after progress of the litigation that the true interests of the parties become apparent. Even if it were necessary to drop East Texas as a party to preserve jurisdiction, still there would be no problem, as illustrated by Anderson v. Moorer, 372 F.2d 747 (5th Cir., 1967) where this was done on appeal. The Fifth Circuit even has held, in such a case, that if the appellate court can see for itself that there has been no prejudice to the remaining parties, it may order judgment upon the basis of the old record. Finn v. American Fire & Cas. Co., 207 F.2d 113 (5th Cir., 1953), cert. denied 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1069. *But see* Wright, *supra*, 292.

---

13. In cases involving stockholders' derivative actions, the corporation often will be aligned as a defendant even though technically its interests are in accord with the stockholders' since the antagonism is sufficient to create the necessary "collision of interests." *E. g.*, City of Dawson v. Columbia Ave. Savings, Fund, Safe Deposit, Title & Trust Co., 197 U.S. 178, 25 S.Ct. 420, 49 L.Ed. 713 (1905). *Cf.* Hamer v. New York Railways Co., 244 U.S. 266, 37 S.Ct. 511, 61 L.Ed. 1125 (1917); Reed v. Robilio, 376 F.2d 392 (6th Cir., 1967) where this principle has been applied to suits by a beneficiary of a

trust, or estate, seeking to enforce a claim by the trust or estate.

14. Even without the "primary and controlling issue" rule of Indianapolis v. Chase National, *supra*, our conclusion here would be the same. An examination of East Texas's interest, as to the secondary issue of whether the decking furnished was defective, is of no help, since its interest varies, depending upon whether it is made a plaintiff or a defendant, the very question to be determined by this examination.

## DEFECTS IN MATERIAL FURNISHED

McMichael contends that the steel decking purchased from East Texas was defective and not in accordance with the basic plans and specifications; that it was required to expend $6,139.00 to bring the decking to specifications; hence, that it is entitled to a credit or offset *pro tanto* against Merco's claim for $17,185.74.

Since the right of the beneficiary of a *stipulation pour autrui* can rise no higher than its source, McMichael may oppose to Merco's claim any defense arising from the contract which is available to it as against East Texas, including a failure of consideration.[15] In Union Bank of Louisiana v. Bowman, 9 La.Ann. 195, 197 (1854), involving a *stipulation pour autrui* in a contract of sale, the Court said:

> "These articles [giving a beneficiary a right of action] do not estop the person making the stipulation from setting up equities; and the right to do so must be determined by a recurrence to such general principles of law and justice as regulate the subject of contracts, and especially the contract of sale."

The Court then held that, if there was a partial failure of consideration, there should be a reduction in price with concomitant reduction in the amount owed by the promisor to the third party beneficiary. It said: "The promise to pay the Bank was a promise sub modo—a promise to pay so much as part of the price of a sale, and justly subject to the defenses incident to such a promise." *Id.*

East Texas warranted, in its subcontract with McMichael, that all materials furnished would be "free from faults and defects and in conformance with Contract Documents." Subcontract, Article 11.9. We conclude, however, that the decking supplied by Merco met the specifications,[16] but partially was defective because of faulty paint. The record is replete with testimony that this decking was supplied with a defective prime coat. Although only one witness could state that the defects existed, when the decking first was delivered, others testified that, at the time of installation, it had a very thin prime coat, with shiney or bare spots where there was no paint at all. At that time the paint was loose or peeling and there were rust spots or speckles covering it. We realize that the rust, and some of the loose paint, was the result of exposure to weather, without a cover, from December 4, 1969, when delivered, until January 14, 1970, when installed. However, the thin paint and bare spots must have existed when the decking was delivered. This conclusion is bolstered by the fact that a subsequent "filler" shipment was found to have these defects when inspected upon arrival, prior to any weather exposure.

After giving Merco and East Texas ample opportunity to provide an adequate solution, McMichael hired a painting contractor to scrape and paint the steel deck at a cost of $6,139.00. This was a reasonable course of action since the decking already was installed; and McMichael faced a deadline for completing the job. In fact, Bailey, with East

---

15. Union Bank of La. v. Bowman, 9 La.Ann. 195, 197 (1854), overruling Arnous v. Davern, 18 La. 42 (1841); Freligh v. Miller, 16 La.Ann. 418 (1862); Brandon v. Hughes, 22 La.Ann. 360 (1870). *Cf.* Lapene v. Delaporte, 27 La.Ann. 252 (1875); Moore v. Clapp, 36 La. 690 (1884); Furlow v. Westover Realty Co., 203 La. 731, 14 So.2d 618 (1943); Pace v. Rizzuto, 182 So.2d 809 (La.App., 4th Cir., 1966). *Smith, supra,* at 56.

16. The specifications called for an Airtherm "typed" steel decking. Airtherm is merely a trade name like Merco and its painting specifications are: "Shop prime coated deck shall be thoroughly cleaned of oil, dirt and rust, and receive a phosphate conversion prior to painting. After the steel is coated with the rust inhibitive shop primer, it shall be baked until the film is dry and hard." Merco's steel decking complies with these specifications.

Texas, gave McMichael authority to take this course of action. Moreover, the subcontract provides that, should East Texas furnish defective materials, McMichael, after three days' written notice, may "make good such deficiencies and may deduct the cost thereof from the payments then or thereafter due" East Texas.[17] Notwithstanding, McMichael may deduct only so much (of the expense of restoring the decking) as is attributable solely to its defective condition when delivered at the job site.

As noted, part of McMichael's expense was attributable to its failure to protect the decking from the elements. Although McMichael was given no specific instructions for caring for the decking and was entitled to presume that the decking properly was painted, common sense dictates that McMichael should have placed a cover over this decking, that was to be exposed to inclement weather for almost six weeks in December and January with only a prime coat of paint to protect it. The nearest thing to a standard of care in the steel decking industry is provided by the Steel Deck Institute, a collection of manufacturers who promote the use of metal decking and promulgate standards for its use. In essence, the Institute recommends that, since the prime coat is not intended to assure protection for extended exposure to the elements, steel decking should be stored above-ground, with one end elevated to provide drainage, and should be protected from the elements with a waterproof covering.[18]

■ We hold that McMichael is entitled to deduct $4,092.67, or two thirds of the $6,139.00 expended to restore the decking, from the $17,109.56 it would owe Merco and East Texas. We find that, since the remaining $2,046.33 of the amount expended by McMichael was attributable to repair of defects caused or aggravated by its fault, it alone must bear this expense. McMichael is not liable for $76.18 charged by Merco for a "filler" shipment, since this decking was part of that which East Texas agreed to supply to McMichael for $17,109.56. Merco must recover this from East Texas.

We do not allow deduction of $2,389.-34 which McMichael claims it expended to complete the subcontract, after East Texas defaulted, because, if for no other reason, no evidence was presented to support this claim. Moreover, Merco's claim for attorney's fees in the amount of $2,000.00 is denied.

■ Normally, legal interest runs from date of judicial demand unless the debtor has been put in default. Reid v. Duncan, 1 La.Ann. 265 (La.S.Ct.1846); La.C.Code, art. 1933. However, since McMichael actively breached its contract February 3, 1970, when it stopped payment on its check, legal interest runs from that date without the necessity of putting it in default by Merco. La.C. Code, art. 1932. But since legal interest at the time of the contract was five per cent per annum, La.C.Code, art. 1938, McMichael is liable only at that rate, despite a subsequent change. La.C.Code,

---

17. Subcontract, Article 11.10:
 "The Subcontractor agrees that if he should neglect to prosecute the Work diligently and properly or fail to perform any provisions of this Subcontract, *the Contractor*, after three days written notice to the Subcontractor, *may*, without prejudice to any other remedy he may have, *make good such deficiencies and may deduct the cost thereof from the payments then or thereafter due the Subcontractor*, provided, however, that *if such action is based upon faulty workmanship or materials and equipment*, the Architect shall first have determined that the workman-

ship or materials and equipment are not in accordance with the Contract Documents." (Emphasis supplied.)
 Even if the architect failed to make this determination here, East Texas waived that requirement when it inspected the decking itself and authorized McMichael to paint it.

18. The Steel Deck Institute publishes these standards in a brochure which is included in Sweet's Catalogue, a collection of manufacturers' brochures, which is distributed to contractors, architects, and others in the construction industry.

art. 1940; Diaz v. Breaux, 252 So.2d 697 (La.App. 1st Cir., 1971).

It is ordered, therefore, that J. P. McMichael Co. pay the sum of $13,016.-89 jointly to East Texas Fabricated Steel, Inc., and Merco Manufacturing, Inc., with interest at the rate of five per cent per annum from February 3, 1970.

It is further ordered that all costs be shared equally by Merco Manufacturing, Inc., and J. P. McMichael Co.