TENARK CONSTRUCTION
CORPORATION

v.

GREAT AMERICAN MORTGAGE IN-
VESTORS, Hosts Consultants, Inc.,
Simpson Braswell Corporation, Jack K.
Simpson, Floyd K. Braswell, and City-
Bank & Trust Company,

Commercial National Bank in Shreveport,
Third-Party Defendant.

Civ. A. No. 74–804.

United States District Court,
W. D. Louisiana,
Shreveport Division.

May 17, 1977.

Whitfield Jack and Fred H. Sutherland, Booth, Lockard, Jack, Pleasant & LeSage, Shreveport, La., for plaintiff.

Sidney B. Galloway, James R. Jeter, and Herschel E. Richard, Jr., Cook, Clark, Egan, Yancey & King, Shreveport, La., for defendants Great American and Commercial National Bank.

J. Edgerton Pierson, Jr., Blanchard, Walker, O'Quin & Roberts, Shreveport, La., for defendant City Bank.

Henry C. Gahagan, Gahagan & Gahagan, Natchitoches, La., for all other defendants.

## RULING ON THE MERITS

DAWKINS, Senior District Judge.

Tenark Construction Corporation (Tenark) agreed to construct a motel in Bossier City, Louisiana, for which it would receive periodic progress payments from a special bank account opened at City Bank and Trust Company (City Bank) in Natchitoches, Louisiana. Plaintiff claims in this diversity action that the defendants listed *infra* breached the financing arrangement by allowing certain transfers of funds, which were intended for the special account, to be deposited in the wrong account, withdrawn without proper authority, and used for unintended purposes. Our jurisdiction rests upon 28 U.S.C. § 1332; venue is proper.

### The Claims and Proceedings

Plaintiff filed its original complaint on August 30, 1976, naming Great American Mortgage Investors (GAMI), Hosts Consultants, Inc., (Hosts), Simpson Braswell Corporation (Simpson Braswell), Jack K. Simpson, and Floyd K. Braswell as defendants.

Tenark settled with GAMI and moved to dismiss it as a defendant. We granted that motion on April 1, 1975.

On May 9, 1975, plaintiff amended its complaint adding another defendant, City Bank. On June 25, 1975, City Bank filed a third-party complaint against GAMI and Commercial National Bank in Shreveport (CNB) and cross-claims against Hosts, Simpson, and Braswell.

On December 1, 1975, GAMI filed a cross-claim against City Bank.

Bench trial began on October 29, 1976, and was completed on November 5, 1976. During trial, we disposed of the following claims: (a) We learned that Simpson had received a discharge in bankruptcy proceedings and that Simpson Braswell no longer existed; hence, Simpson and Simpson Braswell were dismissed, and plaintiff was allowed to proceed against the other named

defendants; (b) plaintiff was granted judgment against Hosts but reserved its rights against Braswell; (c) at the close of the evidence, CNB was granted an involuntary dismissal of City Bank's third-party demand against it. Rule 41(b), F.R.Civ.P.

On April 1, 1977, GAMI filed an order signed by a Bankruptcy Judge in the United States District Court for the Northern District of Georgia, Atlanta Division, which stayed actions involving GAMI pending the outcome of Chapter XI proceedings. However, on April 4, 1977, GAMI filed a supplemental order signed by the same Bankruptcy Judge permitting certain business activities (including defense of this case and prosecution of its cross-claim against City Bank) to continue. Consequently, the stay does not affect our rulings herein.

Following trial, we took the matter under advisement and set post-trial briefing periods. All briefs having been submitted, we now enter our findings of fact and conclusions of law concerning the outstanding claims.

### Findings of Fact

Hosts was the owner of a tract of land in Bossier City, Louisiana. Tenark agreed to build a motel for Hosts on the tract. Hosts and Tenark stipulated in the contract that GAMI would act as interim financier so that Tenark could be paid periodically on the basis of progress reports.

Subsequent to signing this contract, on April 24, 1973, Tenark began work on the project and eventually completed the motel, an Admiral Benbow Inn, in accordance with its plans and specifications. The original agreement provided that Tenark would be paid $833,426, but certain change orders amounting to $15,629 were approved, thus increasing the total contract price to $849,055.

Braswell personally guaranteed payment of any additional funds necessary over the construction loan proceeds. (The other guarantors, Simpson and Simpson Braswell, no longer are parties to this action.)

Hosts paid Tenark $748,815, and Tenark recovered $70,000 from Hosts in Louisiana State Court proceedings. Therefore, Tenark here claims the outstanding balance of $30,240 alleged to be due by Hosts, and by Braswell as guarantor.

Hosts ordered its interim financier, GAMI, to make funds available for construction payments to Tenark, which wanted joint supervision over the funds GAMI released to be certain they were applied properly. Hence, a banking arrangement was confected.

All parties agreed to the opening of a joint account styled "Hosts Consultants, Inc., and Tenark Construction Corporation" at City Bank. Funds deposited in the account were *not* to be distributed *without joint authorization* from proper representatives of *both* Tenark and Hosts. This precaution was designed to assure that the funds forwarded by GAMI would be used only with joint approval by both Tenark and Hosts.

In order to transmit the funds to City Bank rapidly, the following arrangement was made: City Bank was not a national bank, so GAMI could not "wire" money across state boundaries from its office in Atlanta, Georgia, directly to Natchitoches; instead, GAMI instructed the First National Bank in Atlanta to wire the funds to CNB, which in turn wired them to City Bank. The Atlanta and Shreveport banks sent written documents and credit advices confirming these wire transfers (referred to above as "wiring").

The first ten transfers between June 22, 1973, and March 15, 1974, aggregating $853,511.37, from GAMI to City Bank properly were placed in Hosts' and Tenark's joint account; but the final two deposits, on May 23, 1974, and June 28, 1974, in the amounts of $10,000 and $4,022, respectively, incorrectly were deposited in Hosts' separate account, rather than to the joint account. Hosts used the money for its own purposes without Tenark's approval.

City Bank's president, J. E. Pierson, testified that all such transfers coming from GAMI, through CNB, to the joint account were to have been approved by him person-

ally. He either was out of his office or away from the bank when each of the last two transfers erroneously were deposited in Hosts' separate account.

As noted, all of the first ten transfers properly were deposited to the joint account. GAMI wired each of the twelve transfers to "Hosts Consultants, Inc." No one objected to GAMI wiring the funds to Hosts alone. Consequently, GAMI continued this procedure while being led to believe that each transfer correctly would be deposited into the joint account.

City Bank contends that GAMI knew about Hosts' separate account and the joint account with Tenark, consequently, that transfers of funds never should have been designated for Hosts alone. GAMI received one check from Hosts' separate account in payment of interest on May 4, 1976. City Bank argues that this one check—for $343—legally put GAMI on notice that Hosts had a separate account with City Bank.

We conclude that GAMI did not have actual knowledge of the separate account and any constructive knowledge through only one relatively small check for interest is more than overcome by the fact that the first ten transfers of very substantial funds received proper treatment, in accordance with the arrangement among the parties. No one ever notified GAMI of any problems concerning those deposits.

During the very first transfer, Pierson and other bank employees realized that confusion between Hosts' joint and separate accounts was possible. The bank president received the first call transferring the money and instructed bank personnel to make a proper deposit. That call instructed him to enter a credit to Hosts Consultants, Inc. When he realized the bank employees had credited Hosts' separate account, he quickly corrected the error, credited the joint account, and informed several personnel at the bank of the error because he knew any money coming from GAMI in Atlanta through CNB should be placed in the joint account. He did not notify GAMI of the problem; rather, he felt that City Bank could and would deposit the funds correctly.

The record clearly shows that the first through the twelfth transfers were wired to "Hosts Consultants, Inc.," and that the second through the tenth properly were handled by Pierson or his secretary, but several were handled by other personnel. Clearly, several other bank employees besides Pierson knew how to make the deposits properly; nevertheless, the last two were placed in the wrong account—probably due to some bank employee's forgetfulness, or unawareness of the bank's arrangement with GAMI, Tenark and Hosts.

## Conclusions of Law

Through a series of letters, Tenark, Hosts, GAMI, and City Bank agreed to formulate a system for transferring, depositing, and withdrawing quite substantial funds which were to be used only for building the motel. The agreement had the effect of law between the parties, and it delegated several duties to City Bank.[1] The bank obligated itself to credit Hosts' and Tenark's joint account when deposits were wired from Atlanta through CNB, and it consented to honor checks on the account upon joint approval by Hosts and Tenark. City Bank did not violate the latter duty, but, inadvertently of course, it failed to perform its primary responsibility.

Tenark was a party to the agreement; it was not a third-party beneficiary. One prime cause for establishing the joint account was to allow Tenark to monitor the funds which GAMI transferred, but there were other causes as well. Hosts and GAMI wanted assurance that only Tenark would receive what it was due. City Bank was eager to provide its services to enhance customer relations and to increase its cash flow through the bank. GAMI, Hosts, City Bank, and Tenark were all integral parts of

---

1. Louisiana Revised Civil Code of 1870, Article 1901:

"Agreements legally entered into have the effect of laws on those who have formed them.

"They can not be revoked, unless by mutual consent of the parties, or for causes acknowledged by law.

"They must be performed with good faith."

the bargaining and contracting process. Tenark was not the beneficiary of a *stipulation pour autrui.*[2]

■ The agreement cannot be classified properly as a depository obligation because City Bank was not required to return the same money which GAMI transferred to it.[3]

[3] The innominate contract here established amongst the parties is subject to the general principles of conventional obligations although it cannot be classified easily.[4] We are bound to give legal effect to the parties' intentions as set forth *supra.*[5]

As noted, Tenark settled its claims against GAMI and filed the compromise agreement here on April 1, 1975. (Later,

City Bank brought GAMI back into this action by its third-party demand filed here on June 25, 1975.) City Bank argues that it was a joint or solidary obligor with GAMI, and that Tenark, by releasing GAMI, waived or diminished a potential claim against the bank.

■ Even if we were to hold that defendants are solidary obligors, Tenark properly reserved its rights against City Bank in the compromise.[6]

Tenark, Hosts, GAMI, and City Bank arranged the special joint account, but each consented to perform different duties. GAMI contracted to forward loan proceeds upon receiving construction progress reports, as they were needed; City Bank

---

2. La.R.C.C., Article 1890:
   "A person may also, in his own name, make some advantage for a third person the condition or consideration of a commutative contract, or onerous donation; and if such third person consents to avail himself of the advantage stipulated in his favor, the contract can not be revoked."
   And La.R.C.C., Article 1902:
   "But a contract, in which anything is stipulated for the benefit of a third person, who has signified his assent to accept it, can not be revoked as to the advantage stipulated in his favor without his consent."
   See, also, Litvinoff, *Louisiana Civil Law Treatise*, Vol. 6, "Obligations," Book 1, § 169 (1969).
   Compare *Merco Manufacturing Co. v. J. P. McMichael Construction Co.*, 372 F.Supp. 967 (W.D.La., 1974) for a true third-party beneficiary agreement.

3. "If the thing be of the nature of those which are consumed by use, and the depositor has given permission to the depositary to use them [it], the contract is no longer a deposit, but a loan for consumption, and becomes subject to the rules which govern that contract." La.R.C.C. of 1870, Art. 2941.
   "The depositary ought to restore the precise object which he received.
   "Thus a deposit of coined money must be restored in the same specie in which it was made, whether it has sustained an increase or diminution of value." La.R.C.C. of 1870, Art. 2944.
   "The distinction formerly established by law between the perfect and the imperfect deposit, is abolished.
   "The only real deposit is that where the depositary receives a thing to be preserved in kind, without the power of using it, and on the condition that he is to restore the identical object." La.R.C.C. of 1870, Art. 2963.

4. La.R.C.C. of 1870, Art. 1777:
   "Contracts in general, under whatever denomination they may come, and whether they may or may not be included in any of the above divisions, are regulated by certain rules, which are the subject of this title."
   See Litvinoff, *supra*, § 113.

5. La.R.C.C. of 1870, Art. 1945:
   "Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules:
   "*First*—That no general or special legislative act can be so construed as to avoid or modify a legal contract previously made;
   "*Second*—*That courts are bound to give legal effect to all such contracts according to the true intent of all the parties;*
   "*Third*—That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences;
   "*Fourth*—*That it is the common intent of the parties—that is, the intention of all—that is to be sought for;* if there was a difference in this intent, there was no common consent and, consequently, no contract." (Emphasis added.)

6. Compromise filed here on April 1, 1975, at pages 9–10 (Par. E).
   See, also, La.R.C.C. of 1870, Art. 2203, Compromise or Transaction:
   "The remission or conventional discharge in favor of one of the codebtors *in solido*, discharges all the others, *unless the creditor has expressly reserved his right against the latter.*
   "In the latter case, he can not claim the debt without making a deduction of the part of him to whom he has made the remission." (Emphasis added.)
   And Arts. 3071, *et seq.*

promised to deposit the funds properly and to allow withdrawals from the account only when checks were signed dually; Tenark consented to approve necessary withdrawals; and Hosts agreed that Tenark should have joint control over payments made from the account.

The parties did not bind themselves jointly or solidarily to place the funds in the correct account with City Bank. City Bank alone agreed to deposit such forwarded funds in the joint account. Tenark correctly claims that City Bank failed to perform one of its sole responsibilities.[7]

■ In creating the joint account, City Bank agreed to permit withdrawals only upon receiving properly authorized signatures. Louisiana jurisprudence is legion that a dual signature restriction upon withdrawals, such as this, is enforceable. *Davis v. Pioneer Bank & Trust Co.*, 272 So.2d 430 (La.App. 2nd Cir., 1973); *Dousay v. Hillyer-Edwards-Fuller, Inc.*, 19 La.App. 1, 138 So. 164 (2d Cir., 1931); *Le Rosen v. North Central Texas Oil Co.*, 12 La.App. 15, 123 So. 430 (2d Cir., 1929).

■ Tenark does not claim that City Bank violated the signature restrictions; instead, it contends that the bank failed to deposit the last two transfers of funds in the correct account. When a deposit is made, the bank's initial duty is to credit the proper account. This duty is implicit in the bank's later obligation to release the funds only upon jointly authorized signatures.

■ City Bank argues that Tenark was not damaged by misplacement of the funds because the money was transferred to pay a telephone bill and various other fees owed by Hosts, and it never was intended to be used for construction progress. This argument cannot stand for two reasons: (1) The last two transfers were wired using exactly the same procedure and wording as the first ten; and (2) one of the principal purposes of creating the joint account was to allow Tenark a substantial degree of control in distributing the interim loan proceeds.

■ GAMI pleads the doctrine of equitable estoppel in its defense against City Bank's third-party demand. When the first transfer was wired, Pierson and other bank personnel immediately realized there was a potential problem, *i. e.*, depositing the loan proceeds in the wrong account. Pierson corrected the error made during the first deposit, and at that point, City Bank's duty arose (1) to notify GAMI that the correct joint account name should be used on the transfers, or (2) to make certain after each wire transfer that the correct account was credited. City Bank chose the latter course. Accordingly, the bank properly is estopped from arguing that GAMI caused the funds to be misplaced. *Youree v. Limerick*, 157 La. 39, 101 So. 864 (1924) (On rehearing).[8]

In its cross-claim against City Bank, GAMI contends that the bank violated sections 3808 and 3809[9] of the Uniform Fiduci-

7. La.R.C.C. 1870, Arts. 2077, *et seq.*
   Plaintiff likewise reserved its rights against Braswell, who guaranteed personally that Tenark would be paid in accordance with the construction contract. See Joint Exhibit No. 35. Braswell potentially is liable as an accessory since he signed the contract as a surety. La.R.C.C. of 1870, Arts. 3045, *et seq.*

8. GAMI argues that part of City Bank's third-party demand was filed untimely. The bank correctly points out that La.Code of Civil Procedure, Art. 1067 extends the pertinent peremptive period on its third-party demand by 90 days.

9. "§ 3808. Check upon principal's account; liability of bank paying

"If a check is drawn upon the account of his principal in a bank by a fiduciary who is empowered to draw checks upon his principal's account the bank is authorized to pay any such check without being liable to the principal, *unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing such check, or with the knowledge of such facts that its action in paying the check amounts to bad faith.* If, however, such a check is payable to the drawee bank and is delivered to it in payment of, or as security for, a personal debt of the fiduciary to it, the bank is liable to the principal, if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check." (Emphasis supplied.)

aries Law, La.R.S. 9:3801, *et seq.* We find no evidence which supports the theory that the bank was in bad faith when it credited Hosts' separate account or that it had actual knowledge that a fiduciary was breaching an obligation.

For these reasons, we now enter the following rulings:

(1) Tenark shall have judgment against City Bank and Hosts for $14,022;

(2) Subject to (1), Tenark shall have judgment against Hosts for $30,240 in accordance with our ruling on October 29, 1976; and the same amount against Braswell as guarantor in the event Hosts cannot pay;

(3) City Bank's third-party demand against GAMI is rejected; but its cross-claims against Hosts, and Braswell as guarantor, in the sum of $14,022 are granted;

(4) GAMI's cross-claim against City Bank is rejected.

Plaintiff's counsel is ordered to prepare a judgment, approved as to form by all counsel, and submit it to us for signing within ten days.

"§ 3809. Deposit by fiduciary to his personal credit; duties and liabilities of bank

"If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary or of checks payable to him as fiduciary, or of checks drawn by him upon an account in the name of his principal if he is empowered to draw checks thereon, or of checks payable to his principal and endorsed by him, if he is empowered to endorse such checks, or if he otherwise makes a deposit of funds held by him as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, *unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the checks amounts to bad faith.*" (Emphasis supplied.) La.R.S. 9:3808 and 3809.